NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11569


COMMONWEALTH  vs.  CRAIG MULGRAVE.



Essex.     March 6, 2015. - July 13, 2015.

Present:  Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Evidence, Spontaneous utterance, Expert opinion,
    Impeachment of credibility, Cumulative evidence, Relevancy
    and materiality.  Witness, Expert, Impeachment.  Mental
    Impairment.  Practice, Criminal, Capital case, Instructions
    to jury.



Indictment found and returned in the Superior Court
Department on April 2, 2010.

The case was tried before David A. Lowy, J.


Robert S. Sinsheimer (Lisa Parlagreco with him) for the
defendant.
David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.


HINES, J.  In March, 2012, a Superior Court jury convicted

the defendant, Craig Mulgrave, of murder in the first degree on

the theory of extreme atrocity or cruelty in the stabbing death

of his wife, Christina Mulgrave.[1]  On appeal the defendant

asserts that the judge erred in certain evidentiary rulings that

violated his right to due process under the United States

Constitution and the Massachusetts Declaration of Rights:

(1) admitting in evidence as an excited utterance a cellular

telephone text message sent by the victim; (2) granting the

Commonwealth leave to present general evidence that the

defendant made statements, which previously were suppressed, to

impeach proffered evidence that he was noncommunicative; and (3)

excluding the proffered testimony of a defense expert witness.

The defendant also argues error in the jury instructions on

diminished capacity.  We discern no error in the judge's

evidentiary rulings or instructions to the jury.  We decline to

exercise our authority pursuant to G. L. c. 278, § 33E, and

affirm the defendant's convictions.

    1.  Background.  a.  The Commonwealth's case.  The jury

could have found the following facts.  The defendant and the

victim were married in Jamaica in July, 2008.  The two had met

while the victim was on vacation in Jamaica, where the defendant

had lived.  In October, 2009, the defendant obtained a visa and

moved to Las Vegas, Nevada, to join the victim.  The couple

---

    [1] The Commonwealth also had proceeded under a theory of
deliberate premeditation, but the jury did not find the
defendant guilty under that theory.

moved to Haverhill one or two months later, where they would be closer to the victim's two children and her sister.

The victim's sister and son testified that the defendant was depressed and frustrated that he was unable to find employment. In February, 2010, the victim told her sister that there were problems in the marriage and that she had asked the defendant to go back to Jamaica, but he would not leave. Two letters were read in evidence, one from the victim to the defendant and the other his response. The victim's letter expressed her difficulties with the marriage and asked the defendant either to make the marriage work or to separate. The defendant responded by also expressing his unhappiness in the marriage and telling her he felt "unhappy, depressed, without a job, unemployed, dependent on [her] for everything." The defendant expressed his love for her and said that he wanted to "make this right."

On February 7, 2010, the day of the National Football League's Super Bowl, the couple hosted the victim's family for dinner at their apartment. The victim's son, Evan McCain, testified that the defendant left the house during the party and went out walking "all day." The next evening, the victim came home to find the defendant unconscious and lying on the floor with a string tied into a noose around his neck, a knife tucked into the waistband of his pants, and a bottle of alcohol nearby.

The victim, a nurse, took a photograph of the defendant but did not call for medical care. She sent Evan a text message, which prompted him to come over about ten minutes later. The victim and Evan stood over the defendant talking for about ten minutes, during which time the defendant never responded or acknowledged their presence. Evan testified that the defendant "drank a bunch of liquor" that evening. He left the defendant a handwritten note expressing his disapproval.

The following day, on February 9, the victim had an interview at Lowell General Hospital and, thereafter, went to her sister's house. During this visit, the victim told her sister about the incident the prior evening. The sister asked the victim to stay at the sister's home that evening. The victim, however, "was adamant about going home to handle her business" and left at about 1 P.M. for the forty-minute drive to her home. Two hours later, at 3:03 P.M., the victim sent a text message to Evan stating, "He is threatening to kill me I am scared he said if I pick up the phone he will kill me." Six minutes after that, at 3:09 P.M., she telephoned 911 and frantically reported that her husband was stabbing her.

A sergeant with the Haverhill police department arrived at the couple's apartment within two minutes of the 911 call. As the sergeant entered the walkway to the apartment building, he heard a female screaming from one of the upstairs apartments.

He ran up the stairs and entered the apartment on the left side of the hallway.  A few seconds later, a man came out of the apartment on the right side of the hallway.  The sergeant asked him if he heard anything, and the man, later identified as the defendant, responded, "It's in here.  I just killed my wife."

The defendant was standing at the door to the apartment he shared with the victim; he was covered in blood and holding a knife.  The defendant complied with the sergeant's requests to drop the knife and get down on the floor.  After the defendant was handcuffed, the sergeant asked him, "Where is she?," and he motioned toward the office in the front of the apartment.

Inside the office, the victim was lying on her left side on the floor in a pool of blood.  Emergency medical technicians (EMTs) arrived and found the victim with a weak pulse and barely breathing.  The first attempt to ventilate the victim was unsuccessful because air from a breathing tube placed through the victim's mouth escaped from a stab wound in her neck.  A second tube was inserted directly into the stab wound and down into the lungs.  As the EMTs continued to render aid to the victim, they transported her to Merrimack Hospital, where she was pronounced dead shortly after arrival.

An autopsy revealed twelve stab wounds, twelve incise wounds, and miscellaneous blunt force injuries.  Of the stab wounds, nine were to her torso, one to her left arm, one to her

right arm, and one to her right shin.  Three of the stab wounds penetrated her lungs, two penetrated her liver, and a stab wound in her neck penetrated her trachea.  The medical examiner who performed the autopsy testified that the specific cause of death was blood loss and puncture injuries to the lung and trachea, which inhibited the body's ability to oxygenate.  The crime scene analyst who inspected the apartment testified that the location of the blood inside the office demonstrated that the victim was upright when some of the stab wounds were inflicted and was lying down or very low to the ground when other stab wounds were inflicted.  The knife that the defendant was holding when the sergeant arrived had the victim's blood on it and the defendant's fingerprint on the handle.

The defendant was arrested at the scene and taken to the Haverhill police station.  He was wearing the same clothes as during the incident the prior evening and the string was still tied around his neck as a noose.  The patrolman who transported the defendant testified that the defendant had no alcohol odor, no difficulty walking, and no difficulty getting into or out of the cruiser.  A bottle of rum, approximately two-thirds full, and several prescription medication bottles containing pills were seized from the apartment after the stabbing.

b.  <u>The defendant's case</u>.  The defendant conceded guilt as to murder in the second degree but argued that depression

rendered him incapable of the elevated mental state required for murder in the first degree. He introduced the testimony of three mental health experts and his cousin. The experts all had experience working with depression and explained the various stressors that could worsen depression symptoms. Specifically, the experts noted that unemployment, cultural transition, and breakdown of a marriage can intensify depression. The defendant's cousin testified that she talked to him about once a week while he was in Las Vegas, but hardly at all once he was in Massachusetts. She stated that it was a big opportunity for the defendant to go to the United States and that he would have looked like a failure if he had returned to Jamaica.

The defendant's first expert, Ronald P. Winfield, a psychiatrist, did not interview the defendant but explained that depression is an imbalance in brain chemicals that can cause unusual brain function, especially when triggered by stressors. Two additional experts interviewed the defendant multiple times and diagnosed him with a major depressive disorder at the time of the stabbing. Both experts, Robert H. Joss, a forensic psychologist, and Elizabeth Davis, a psychiatrist, opined that the defendant lacked the capacity to deliberately premeditate or to act with extreme atrocity or cruelty because of his depression.

Doctors Joss and Davis reviewed the defendant's medical records from before the stabbing, which showed that the defendant was diagnosed on December 22, 2009, with depression with anxiety, and was prescribed Celexa, an antidepressant. The record of the appointment references tearfulness, suicidal ideation, and anxiety on the part of the defendant. Based on the number of pills remaining in the Celexa bottle found in the apartment, the defendant was not taking this medication as directed, rendering the drug ineffective in ameliorating his symptoms. During his interviews of the defendant, Dr. Joss observed that the defendant appeared depressed, weary, and without much energy. Doctor Joss opined that the defendant was not faking depression because his prearrest medical records were consistent with his symptoms after the stabbing.

Doctors Joss and Davis testified that they would have considered immediate psychiatric hospitalization of the defendant if they had found him in the state he was in the evening before the stabbing. The defendant told the experts that, on the night before the stabbing, he consumed an excessive amount of alcohol and ingested pills.[2] Doctor Davis opined that the defendant's actions on the night before the stabbing

---

[2] These statements were not admitted for their truth but only as information on which the experts based their opinions.

indicated that he was in the "throes of making a suicide attempt."

c. The Commonwealth's expert. In rebuttal, the Commonwealth called Martin Kelly, a psychiatrist who evaluated the defendant and reviewed medical records, including the reports from Drs. Joss and Davis. Doctor Kelly opined that the defendant did not suffer from any mental defect or disease at the time of the stabbing; instead, he had situational or reactive depression. He described situational or reactive depression as a psychological condition, not a mental disease. He further explained that this condition is time limited and occurs after some sort of loss, such as a breakup of a relationship, unemployment, or cultural adjustment.

d. Excluded evidence. Prior to trial, a motion judge granted the defendant's motion to suppress statements made to police shortly after booking. The motion judge concluded that the statements were made in violation of the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. At trial, however, the defendant sought to introduce evidence, through cross-examination of a police officer, that he was silent and noncommunicative during booking as a factor demonstrating diminished capacity. The Commonwealth argued that such testimony would open the door to allow the suppressed statements to be admitted. The trial judge noted

that the purpose of the rebuttal would be to show the defendant's capacity to answer questions, not the content or truth of the statements, and indicated that he would be inclined, if the defendant elicited such testimony, to allow the Commonwealth to introduce evidence about the number of questions asked and the defendant's manner and demeanor in answering the questions. The fact that the statements were made, but not the content of the statements, would be admitted. The defendant declined to introduce the evidence in light of that ruling.

The defendant also sought to introduce the testimony of a fourth medical expert, William Alan Stuart, an emergency medicine physician. The defendant intended to have Dr. Stuart testify to the effects of combining Celexa and alcohol and that the defendant's actions the night before the stabbing constituted a suicide attempt. Further, this proposed testimony would have included the witness's opinion that he too would have commenced an involuntary commitment if he had been aware of the events occurring the evening before the stabbing.

After conducting a voir dire, the judge denied the defendant's request to introduce testimony from this expert. The judge excluded the testimony on the following grounds: (1) the proposed testimony was cumulative, as Dr. Davis already had opined that the defendant made a suicide attempt; (2) the proposed testimony had only limited relevancy, because the jury

could infer that the defendant was suicidal without expert testimony; (3) the jury likely would be confused as to the relevant time frame (the night before the stabbing or the day of the stabbing) in which to consider the defendant's mental state; and (4) the testimony, to the extent that it focused on what Evan and the victim should or should not have done on finding the defendant on the evening before the stabbing, would cause undue prejudice.

2. Discussion. a. Evidentiary issues. i. Text message. The defendant argues that the judge erred in admitting the content of the text message sent by the victim to her son approximately six minutes before she telephoned 911. The judge reasoned that the written statement, although hearsay, was admissible under the spontaneous utterance exception to the hearsay rule. Mass. G. Evid. § 803(2) (2015). The defendant objected to the admission of the text message, so we review for prejudicial error. Commonwealth v. Sleeper, 435 Mass. 581, 590 (2002).

Under our rules, admissibility under the spontaneous utterance exception requires that (1) "there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer'"; and (2) the statement was "a spontaneous reaction to the occurrence or event and not the result of reflective thought." Commonwealth v.

Irene, 462 Mass. 600, 606-607, cert. denied, 133 S. Ct. 487 (2012), quoting Commonwealth v. Santiago, 437 Mass. 620, 623 (2002). The defendant argues that the text message sent by the victim fails to meet either requirement for admissibility.[3] We disagree and conclude that the judge committed no error in admitting the victim's cellular telephone text message in evidence.

While Massachusetts appellate courts have yet to approve admission of text messages or any other writing under the spontaneous utterance exception to the hearsay rule, this exception does not categorically exclude written statements from its scope. We have acknowledged that a written statement may be considered a spontaneous utterance if it satisfies a heightened indicia of reliability. See Commonwealth v. DiMonte, 427 Mass. 233, 237-240 (1998). There we explained that "[b]ecause a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before we could conclude that the

_____

[3] The defendant also argues that the message was not sufficiently authenticated as being sent by the victim. In the circumstances of this case, where the defendant did not contest the authenticity of the text message during the trial, the authenticity requirement was satisfied by Evan's testimony and his cellular telephone records showing a message originating from the victim at 3:03 P.M.

writing qualified as a spontaneous exclamation." Id. at 239.
The heightened indicia of reliability requirement, however, does
not impose an additional test in the spontaneous utterance
analysis. Rather, it is intended only to ensure that a writing,
which generally is a product of reflection, meets the
spontaneity requirement. Thus, although we examine a writing
more closely on the element of spontaneity, the analysis is the
same as for an oral statement.

The first requirement, that there be an exciting event
giving rise to the exception, is clearly satisfied by the
statement itself, the 911 telephone call, and the victim's
condition approximately ten minutes later.[4] See Commonwealth v.
Nunes, 430 Mass. 1, 4 (1999), citing Commonwealth v. Whelton,
428 Mass. 24, 27 (1998) ("The statement itself may be taken as
proof of the exciting event"). The victim stated in her text
message, "He is threatening to kill me I am scared he said if I
pick up the phone he will kill me." Although the record

_____

[4] The defendant acknowledges that the content of the text
message statement itself satisfies this requirement, but
asserts, without citation to any cases, that the confrontation
clause of the Sixth Amendment to the United States Constitution
requires that there be additional evidence of the event besides
the statement. Regardless of whether the defendant's argument
has any basis in law, the occurrence of an exciting event having
very recently occurred was confirmed by the condition of the
victim and apartment when the police arrived minutes later. See
Commonwealth v. Whelton, 428 Mass. 24, 26-27 (1998).

contains no further information about the events occurring at that moment, it is established that six minutes later the victim frantically telephoned 911 to report that her husband was stabbing her and, only a few minutes after that, she was found barely breathing and lying in a pool of blood.

In determining the second element of spontaneity, we consider the circumstances of the statement, including the temporal relation between the event and the statement, and the tone and manner of the declarant. Commonwealth v. Simon, 456 Mass. 280, 296, cert. denied, 562 U.S. 874 (2010); Santiago, 437 Mass. at 623, 625; DiMonte, 427 Mass. at 239. Because the statement at issue here is a writing, we also consider whether and to what extent the requisite spontaneity is compromised by this method of communication.

Here, the circumstances of the statement, although in the form of a cellular telephone text message, are entirely consistent with spontaneity. As described above, the victim telephoned 911 to report that the defendant was stabbing her six minutes after the text message to her son reporting that the defendant was "threatening to kill" her. This sequence of events closely resembles a scenario mentioned in DiMonte, 427 Mass. at 239, where we observed that a writing may be admissible "when a victim is held hostage and is unable to communicate in

15

any way other than writing or when a person's vocalization is impaired" (footnote omitted).

The circumstances under which the text message was sent adequately compensate for the limitations inherent in a writing and meet the spontaneity test. Cellular telephone text messages are a unique form of written communications in that they allow for instant communication in much the same way as oral communications. The cellular technology that allows for the sending and receiving of a text message instantly, often as a substitute for oral expression, diminishes the concern about spontaneity that might arise with other more deliberative modes of written communication. Further, the growth of cellular telephones has made text messaging and other types of written electronic statements ubiquitous forms of rapid communication.[5] For a person proficient in the use of the cellular telephone technology, sending a text message may involve no more effort

---

[5] In Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534 (D. Md. 2007), a judge of the United States District Court for the District of Maryland reviewed case law interpreting evidentiary rules for application to electronic communications. The judge concluded that electronically stored communications may be admissible under the Federal rule governing spontaneous utterances, Fed. R. Evid. § 803(2), noting the "prevalence of electronic communication devices, and the fact that many are portable and small, means that people always seem to have their laptops, [personal digital assistants], and [cellular telephones] with them, and available for use to send [electronic mail messages] or text messages describing events as they are happening." Id. at 569.

than verbalizing a thought, feeling, or emotion in response to an event.  A cellular telephone user may choose between verbal and written communication without sacrificing immediacy in the communication of the message.[6]  This opportunity for instant communication by way of cellular telephone technology elevates text messages, at least on the spontaneity scale, beyond the level of an ordinary writing.  See DiMonte, 427 Mass. at 239.  Thus, we conclude that the spontaneity requirement is not undermined in this case by the fact that the statement is a writing in the form of a cellular telephone text message.

Although the temporal relation requires no definite and fixed limit of time for spontaneity, "the further the statement from the event, the more difficult it becomes to determine whether the statement is the result of reflection, influenced by other factors."  DiMonte, 427 Mass. at 239, citing Commonwealth v. McLaughlin, 364 Mass. 211, 223 (1973).  The rationale behind the temporal relation is that statements made before the

---

[6] More text messages are sent and received by cellular telephone users than voice minutes are expended.  According to a Nielsen study conducted in 2012, ninety-four per cent of United States consumers age sixteen years and older use a cellular telephone, and the average United States cellular contract user sent or received 764.2 text messages and used 644.1 voice minutes per month.  See The Nielsen Company, The Mobile Consumer:  A Global Snapshot 7, 19 (Feb. 2013), available at http://www.nielsen.com/content/dam/corporate/uk/en/documents/Mobile-Consumer-Report-2013.pdf [http://perma.cc/VYX5-WCL8], citing Nielsen Consumer Value Metrics (2012).

declarant has time to "contrive and misrepresent" would be admitted, while others made after the "exciting influence [has lost] its sway" would be inadmissible.  McLaughlin, supra, quoting 6 J. Wigmore, Evidence § 1750 (3d ed. 1940).  In this case, the statement occurred within a reasonable temporal proximity to the exciting event because the victim's subsequent 911 telephone call and death shortly thereafter demonstrate that the event was in progress when she sent the text message.

Likewise, the tone and manner of the declarant, as evidenced by the writing itself, supports a determination that this statement was spontaneous, and thus reliable.  See Simon, 456 Mass. at 296.  The message was one sentence without any punctuation.  The message related only to the circumstances of the threat to the victim's safety and her reaction (fear) to that threat.  In contrast, the facsimile transmission in DiMonte, 427 Mass. at 234 n.4, which we said was not spontaneous, was much longer and related to arrangements for an upcoming concert at which the victim was to sing in addition to the prior assault.

For all the reasons explained above, we are persuaded that the circumstances of the statement, the tone and manner of the statement and its timing, establish the second requirement of the spontaneous utterance exception to the hearsay rule.  The judge's decision to admit the statement was sound.

Last, statements admissible as spontaneous utterances must also satisfy the confrontation clause of the Sixth Amendment to the United States Constitution.  See Irene, 462 Mass. at 609.  "The confrontation clause bars the admission of testimonial out-of-court statements by a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had an earlier opportunity for cross-examination."  Id. at 617, citing Crawford v. Washington, 541 U.S. 36, 53-54 (2004).  "Whether a particular statement is 'testimonial' lies at the core of this analysis."  Irene, supra, citing Davis v. Washington, 547 U.S. 813, 823-824 (2006).  The defendant asserts that the statement was testimonial in fact because the victim did not ask for help or describe an earlier event and that she instead intended to establish the identity of her potential perpetrator.  We disagree with the defendant's characterization of the statement.

"A statement is testimonial in fact if 'a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting the crime.'"[7]  Simon, 456 Mass. at 297, quoting Commonwealth v.

---

[7] Whether a statement is testimonial in fact is the second step in determining whether a statement was testimonial. Commonwealth v. Simon, 456 Mass. 280, 297, cert. denied, 562 U.S. 874 (2010).  The statement was not testimonial per se, which is the subject of the inquiry in the first step, because

Gonsalves, 445 Mass. 1, 12-13 (2005), cert. denied, 548 U.S. 926 (2006). Although the victim did not explicitly ask for help, she wrote, "He is threatening to kill me I am scared he said if I pick up the phone he will kill me."  Further, she did not name the defendant, a fact likely to be communicated by a declarant attempting to establish her perpetrator's identity.  Rather, the statement is more properly characterized as one made in the context of an ongoing emergency for which the victim sought assistance.  Thus, the judge did not err in admitting the text message.

   ii.  Availability of suppressed statement for impeachment. The defendant argues that the judge erred in ruling that the Commonwealth would be permitted to rebut evidence of the defendant's mental capacity insofar as it rested on the claim that he was noncommunicative during booking and during his receipt of Miranda and telephone rights.  Although the judge explicitly ordered that the content of the statements would not be admitted, he ruled that the Commonwealth would be allowed to ask certain questions, such as, "Were there other questions asked . . . [h]ow many other questions were asked . . . what was his manner and demeanor in answering those questions and what were the general areas of conversation."  The defendant argues

---

the statement was not made in a "formal or solemnized form" or "in response to law enforcement interrogation."  Id.

that this ruling was error for two reasons: (1) the statements were involuntary and thus inadmissible for any reason; and (2) even if the statements were allowed to impeach the defendant's testimony, they could not be used to impeach his experts' testimony.

Both of these arguments are unavailing. The trial judge, after reviewing the transcript from the hearing on the motion to suppress and the video recording of the interrogation, concluded that the defendant's statements were voluntary because the defendant did not appear to be under the influence of drugs or alcohol, reported that he physically felt good, was tuned into subtleties, and responded to the police officer directly on the issues.[8] The judge's conclusion is well supported by the record. See Commonwealth v. LeBlanc, 433 Mass. 549, 554 (2001). Accordingly, the rule cited by the defendant, that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law," is not applicable here (emphasis in original). Commonwealth v. Durand, 457 Mass. 574, 591-592 (2010), quoting Mincey v. Arizona, 437 U.S. 385, 398 (1978).

The defendant's argument fails for the additional reason that the judge precluded the admission of the content of the

---

[8] The motion judge, suppressing the statements on other grounds, did not decide the issue of voluntariness.

statements. The judge ruled that only evidence of the defendant's ability to communicate would be admitted and only for the purpose of impeaching the defendant's claim that he was noncommunicative in the aftermath of the killing. Evidence of the defendant's ability to answer questions, offered only to rebut evidence of the defendant's noncommunicability, is not barred by the Fifth or Fourteenth Amendment to the United States Constitution, or by art. 12.[9]

The defendant next argues that this ability to communicate, as established by the existence of (the subsequently suppressed) statements to the police, was not admissible to impeach his expert witnesses even if such statements would have been admissible against him. The defendant's argument stems from the limitations on the impeachment exception to the exclusionary rule as set forth in James v. Illinois, 493 U.S. 307, 320 (1990). The exclusionary rule bars the prosecution's use of statements, even if voluntary, that were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 444 (1966), unless an exception applies. James, supra at 312, citing Harris v. New York, 401 U.S. 222, 225 (1971), and Oregon v. Hass, 420 U.S.

---

[9] The defendant's silence in response to Miranda warnings and booking questions, sought at trial to demonstrate mental impairment, was considered by the motion judge as evidence that the defendant invoked his right to remain silent and was accordingly used to support suppression.

714, 722 (1975). Under the impeachment exception, "prosecutors [may] introduce illegally[10] obtained evidence for the limited purpose of impeaching the credibility of the defendant's own testimony." James, supra at 312. In James, the United States Supreme Court declined to extend the impeachment exception to allow impeachment of "all defense witnesses" because doing so "would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule." Id. at 320. We have yet to interpret the meaning of "all defense witnesses," and we decline to do so now. Suffice it to say, evidence that the defendant answered a number of questions, without relating the content of the statements, that is offered for the purpose of showing communicability is not an impermissible use of illegally obtained statements and, therefore, does not offend the rule in James.

iii. Exclusion of expert witness testimony. The defendant argues that the judge violated his right to present a defense and call witnesses under the Sixth Amendment and under art. 12 by excluding the testimony of Dr. Stuart, whose testimony would review the effects of combining Celexa and alcohol and was

---

[10] The statements suppressed in James v. Illinois, 493 U.S. 307, 313 (1990), were obtained in violation of the Fourth Amendment to the United States Constitution, not the Fifth Amendment to the United States Constitution as applicable in this case.

proffered to show that the defendant's conduct the night before the stabbing was a legitimate suicide attempt. The judge excluded the testimony as cumulative, of limited relevancy, and unduly prejudicial, and because it could confuse the jury as to the relevant time frame in which to consider the defendant's mental state. "[A] trial judge has the discretion to control the scope of the examination of witnesses . . . and can exclude witnesses whose testimony is cumulative, repetitive, or confusing." Commonwealth v. Boyarsky, 452 Mass. 700, 711 (2008), quoting Commonwealth v. Carroll, 439 Mass. 547, 552-553 (2003). "In addition, questions of relevancy 'are entrusted to the trial judge's discretion and will not be disturbed except for palpable error.'" Commonwealth v. Wilson, 427 Mass. 336, 349 (1998), quoting Commonwealth v. Azar, 32 Mass. App. Ct. 290, 300 (1992).

Although Dr. Stuart was to be the only expert testifying about the effects of Celexa and alcohol in combination, there was no evidence about the quantity of alcohol or drugs ingested at or near the time of the stabbing.[11] While the expert intended

---

[11] A defense expert witness testified that the defendant told him he consumed an excessive amount of alcohol and took pills on the evening before the stabbing, but these statements were not admitted for their truth. The jury also heard evidence that a bottle of rum two-thirds full and several prescription bottles of pills were located in the apartment after the stabbing.

to testify about the drug and alcohol combination to demonstrate that the defendant actually attempted suicide and not to show that the combination directly affected his state of mind the day of the stabbing, another expert had already testified that the defendant's actions were a suicide attempt.  The judge did not abuse his discretion in excluding Dr. Stuart's testimony.

b.  <u>Diminished capacity instruction</u>.  The defendant argues that the judge committed reversible error by failing to instruct the jury that they could consider evidence of diminished capacity as it related to the defendant's ability to act with extreme atrocity or cruelty, as required by <u>Commonwealth</u> v. <u>Rutkowski</u>, 459 Mass. 794, 798 (2011).  Instead of giving the form of instruction approved in <u>Commonwealth</u> v. <u>Gould</u>, 380 Mass. 672, 686 n.16 (1980), as proposed by defense counsel, the judge gave the model jury instruction.  See Model Jury Instructions on Homicide 61-62 (1999).  The defendant's argument is unavailing because the judge instructed the jury in accordance with <u>Rutkowski</u>, <u>supra</u>.[12]  A judge is not required to give the precise

_____

[12] The relevant portion of the jury instructions are as follows:

"<u>More particularly, you may consider any credible evidence of the defendant's mental impairment, and/or the use of drugs, in determining whether</u> the defendant deliberately premeditated the killing of the deceased, that is whether the defendant thought before he acted, and whether the

instruction proposed by the defendant or as set forth in Gould.

See Commonwealth v. Szlachta, 463 Mass. 37, 48-49 (2012), citing

Commonwealth v. Sanders, 451 Mass. 290, 300 (2008), and

Commonwealth v. Oliveira, 445 Mass. 837, 848 (2006).  There was

no error.

    c.  Review under G. L. c. 278, § 33E.  We have reviewed the

entire record and see no reason to exercise our power under

G. L. c. 278, § 33E, to reduce the degree of guilt as requested

by the defendant or to grant other relief.

                        Judgment affirmed.

---

    defendant reached the decision to kill after reflection, at least for a short period of time, and whether the defendant acted in a cruel or atrocious manner, in causing the death of the deceased" (emphases added).