[Cite as *State v. Young*, 2016-Ohio-7477.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103551**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LEONARD J. YOUNG

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-595168-A

**BEFORE:** Keough, J., Jones, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** October 27, 2016

**ATTORNEY FOR APPELLANT**

John T. Forristal
P.O. Box 16832
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Andrew F. Rogalski
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Leonard J. Young, appeals from the trial court's judgment, rendered after a bench trial, finding him guilty of rape and kidnapping and sentencing him to nine years incarceration. We affirm.

## I. Background

{¶2} In April 2015, Young was indicted on one count of rape in violation of R.C. 2907.02(A)(2) and one count of kidnapping in violation of R.C. 2905.01(A)(4). Both counts carried repeat violent offender, sexually violent predator, and notice of prior conviction specifications; the kidnapping count also contained a sexual motivation specification. Young waived his right to a jury trial, and the matter proceeded to a bench trial.

{¶3} The victim, C.C., testified that she moved to Cleveland in April 2014, and met Young a few months later. C.C., who was living in a women's shelter, complained to Young about her living arrangements, and he invited her to move in with him temporarily. C.C. moved in with Young at the end of the summer.

{¶4} Their relationship, which was initially platonic, became intimate in the late fall. C.C. testified that "everything was fine" at the beginning, but the relationship deteriorated after a few months. C.C. said that Young "got mean" and became emotionally, verbally, and once or twice physically abusive. C.C. testified that Young

eventually told her that he wanted her out of his apartment, and once even locked her out of the apartment for a night to try to force her to leave. She said she continued to live with him, however, because she had not yet saved enough money to afford her own place. C.C. admitted that she and Young continued to have consensual sex even though they argued frequently, and testified that she had sex with Young three days before the alleged rape.

{¶5} C.C. testified that in early April 2015, she decided to move out of Young's apartment and packed her clothes so she would be ready to move if she found a new apartment or decided to go back to Memphis. According to C.C., on April 15, 2015, Young called the police, as he had done before, to complain about her. When the police responded to the apartment, they told Young that he could not just force C.C. out of the apartment but would have to start formal eviction proceedings if he wanted her to leave.

{¶6} C.C. testified that Young called the police again the next afternoon to complain about her, but they never responded to the apartment. After the call, Young videotaped her as she was getting dressed and threatened to put the video on YouTube to embarrass her. A short time later, she sat on the bed exchanging text messages with her mother while Young lay on the bed behind her. Both were fully clothed. C.C. said that as she was texting with her mother, Young told her that "if you don't hurry and get out of my house, something drastic is going to happen." C.C. said she did not pay any attention to Young, and called a girlfriend, who told C.C. she could stay with her. According to

C.C., as she was texting her mother about her plans to stay with her girlfriend, Young left the bedroom.

{¶7}  C.C. said that she looked up a moment later when the lights went out and saw Young, who was naked, standing in the bedroom.  C.C. testified that Young walked over to her, pushed her down on the bed, pulled her pants off (C.C. said she does not wear underwear), and got on top of her.  C.C. said that at first she thought Young wanted sex one more time before she left, and she was laughing as she pushed herself up and told him, "This isn't gonna happen."  But when Young pushed C.C. down again, she began fighting him off, yelling "get the hell off me."  According to C.C., Young used one knee to hold one of her legs open and his hand to hold down her other leg.  As she struggled with him, they fell to the floor.  C.C. said that Young jumped on top of her again, and managed to penetrate her vagina with his penis.  C.C. testified that the rape ended after she kicked Young in his chin with her left leg and used her right leg to push him backward.  Before she gathered her belongings to leave, C.C. texted her mother that Young had just raped her.  She said she "left [Young] on the bed sweating," grabbed her belongings and left the apartment.

{¶8}  C.C. said that she put her pants on in the hallway and then went outside to the corner, where she called 911 and reported the rape, and then waited for the police.  C.C. said that Young texted her twice before the police arrived.  The first text, sent at 6:18 p.m. (before the 911 call was made), stated:

> From the beginning this was only supposed to be temporary.  Somewhere along the lines you lost focus, the plan you gave me in the beginning wasn't

being followed and you didn't wanna share your changes. I'm sorry it ended this way, but you haven't shared a plan to get into you own, and I'm no longer willing to deal with you violating my personal space and boundaries.

{¶9} C.C. responded at 6:24 p.m., stating, "U sexually assaulted me nothing else to talk about." At 6:38 p.m., Young texted back, "I see that it's a good thing we split up, I wish you the best."

{¶10} Cleveland police officer James Houska testified that he responded to Young's apartment on April 15, 2015, in response to Young's complaint about C.C. Houska said it was obvious that Young and C.C. were not getting along, and that Young wanted C.C. out of his apartment but she did not want to leave. Houska said that the police told Young that he would have to initiate formal eviction proceedings to force C.C. to leave.

{¶11} Houska testified that on April 16, 2015, he was dispatched to the corner of West 112th Street and Detroit Road, about a half-block from Young's apartment, in response to C.C.'s 911 call. Houska testified that the 911 call, which was played at trial, was made at 6:21 p.m., and that C.C. told him and his partner that the rape had occurred at approximately 5:14 p.m. Houska said that C.C. was coherent and did not appear upset, and neither her hair nor clothes were in disarray. Houska and his partner took a report from C.C. and transported her to Fairview Hospital.

{¶12} Alexandria Rosa, a sexual assault nurse examiner, testified that she examined C.C. at Fairview Hospital on the evening of April 16, 2015. Rosa said that C.C. told and demonstrated what had happened to her. Rosa testified that during her

examination of C.C., she observed bruises on C.C.'s legs and inner thighs. She testified that the "most striking bruises" were bruises on C.C.'s right inner thigh that seemed consistent with a hand print. Rosa took photographs of these injuries. She also performed a rape kit examination, which included swabbing C.C.'s inner thighs. Rosa testified that C.C. told her that she had bathed prior to coming to the hospital.

{¶13} Carey Baucher, a DNA analyst in the Cuyahoga County Medical Examiner's office, testified that no foreign DNA was discovered in the swabs of C.C.'s vaginal or anal areas. She testified that there was foreign DNA in the swab from C.C.'s right inner thigh, but Young could not be included nor excluded as the contributor of this foreign DNA.

{¶14} Young testified in his defense that he had invited C.C. to stay with him for three to six months, but after she moved in, she refused to leave. He admitted that he once locked her out of the apartment and at other times took away her keys or played loud music to try to force her to leave. He said that he could not start formal eviction proceedings against C.C. because he would lose his housing subsidy if it became known that someone else was living with him.

{¶15} Young testified that he and C.C. had consensual sex on April 15, 2015. He said that he and C.C. argued again on April 16, 2015, about her not leaving his apartment, and he said he videotaped her after the argument and threatened to post it on YouTube if she did not leave. Young said that C.C. left his apartment on April 16, 2015, around 4 p.m., and he did not see her again until he saw her in court in September 2015. He

testified that he exchanged a few texts with C.C. after she left his apartment on April 16, 2015, because someone he was talking to on Facebook told him that he should apologize to her. He said that C.C.'s text accusing him of sexually assaulting her was not truthful, and he did not respond to it because he was tired of arguing with her and did not want to defend himself. The parties stipulated that Young had a prior conviction for rape in Cuyahoga C.P. No. CR-05-466921.

{¶16} The trial court found Young guilty of rape with the notice of prior conviction specification, and kidnapping with the sexual motivation and notice of prior conviction specifications. It found him not guilty of the sexually violent predator specifications, and dismissed the repeat violent offender specifications as not properly charged. The convictions merged, and the state elected to proceed on Count 1, rape. The court sentenced Young to nine years incarceration and five years postrelease control, and determined that he is a Tier III sex offender. This appeal followed.

{¶17} After briefing was complete and oral argument set, this court granted the motion of Young's original appellate counsel to withdraw, appointed new counsel for Young, and reset oral argument to allow Young's newly-appointed counsel to file a supplemental appellate brief. Young's new counsel and the state subsequently filed supplemental briefs. This opinion addresses the arguments contained in both the original and supplemental briefs filed by the parties.

## II. Law and Analysis

### A. Admission of Texts as Excited Utterances

**{¶18}** C.C. testified that she texted her mother prior to the rape and told her that she was leaving Young's apartment to go to her girlfriend's house. C.C. testified that her phone pinged three times while the rape was happening. An analysis of her phone showed that C.C. texted her mother at 5:02 p.m. about going to her girlfriend's, and that C.C.'s mother texted back three times: once before 5:12 p.m. (the exact time not provided), at 5:12 p.m. and then again at 5:14 p.m. The trial court admitted the three texts from C.C.'s mother not for their content but to demonstrate that C.C. received three messages from her mother before she responded to her at 5:24 p.m. Young does not object to the admission of these text messages.

**{¶19}** At 5:24 p.m., C.C. texted her mother "he raped me," and at 5:25 p.m. she texted "just now." At 5:30 p.m., C.C. texted her mother, "I fought him off he got nothing else," and then at 5:32 p.m., "heard me say was bout [sic] to go and snatched down my pants and we were fighting from there." The trial court admitted these texts as excited utterances not subject to exclusion by the hearsay rule. In his first assignment of error, Young contends that the trial court erred in admitting these texts as excited utterances.

**{¶20}** The record reflects that defense counsel did not object to the admission of the texts, however, and, in fact, conceded that the texts were indeed excited utterances. With respect to the admission of the texts sent at 5:24 p.m. and 5:25 p.m., defense counsel stated, "You know, I don't have any great objection to that. I think he did establish the excited utterance exception." (Tr. 415.) Later, when the judge and counsel were

discussing the texts sent at 5:30 p.m. and 5:32 p.m., the trial judge confirmed that the basis for their admission was the excited utterance exception to the hearsay rule, and defense counsel stated, "Okay.   I won't object to those for the record."   (Tr. 419.)

{¶21} Because counsel did not object to the admission of the texts, Young has waived all but plain error regarding the admission of the texts.  *Telecom Acquisition Corp. I. v. Lucic Ent., Inc.*, 8th Dist. Cuyahoga No. 102119, 2016-Ohio-1466, ¶ 57, citing *State v. York*, 115 Ohio App.3d 245, 249, 685 N.E.2d 261 (4th Dist. 1996) (failure to raise and argue the excited utterance exception at trial waives the issue on appeal); *State v. Allen*, 8th Dist. Cuyahoga No. 62275, 1993 Ohio App. LEXIS 4392, * 68 (Sept. 9, 1993), citing *State v. Wiles*, 59 Ohio St.3d 71, 86, 571 N.E.2d 97 (1991).

{¶22} Plain error exists only where but for the error, the outcome of the trial clearly would have been different.  *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61.   It is applied only under exceptional circumstances and only to prevent a manifest miscarriage of justice.  *Id.*   We find no plain error in this case.

{¶23} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  Such statements are inadmissible unless an exception to the hearsay rule applies.  Evid.R. 802.  One such exception is an excited utterance, which is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Evid.R. 803(2).

To fall into the exception, four elements must be satisfied: (1) a startling event; and (2) a statement relating to that event; (3) made by a declarant with firsthand knowledge; (4) while the declarant was under the stress of the excitement caused by the event. *State v. Dean*, 146 Ohio St.3d 106, 111, 54 N.E.3d 80 (2015).

**{¶24}** Young contends that a text can never be an excited utterance because the act of taking time to compose and send a text requires thoughtful reflection. Therefore, he contends, unlike an excited utterance, a text is not merely a spontaneous reaction to an event.

**{¶25}** This argument is without merit. As stated in *Commonwealth v. Mulgrave*, 472 Mass. 170, 178-179, 33 N.E.3d 440 (2015):

> The cellular technology that allows for the sending and receiving of a text message instantly, often as a substitute for oral expression, diminishes the concern about spontaneity that might arise with other more deliberate modes of written communication. Further, the growth of cellular telephones has made text messaging and other types of written electronic statement ubiquitous forms of rapid communication. For a person proficient in the use of the cellular telephone technology, sending a text message may involve no more effort than verbalizing a thought, feeling, or emotion in response to an event. A cellular telephone user may choose between oral and written communication without sacrificing immediacy in the communication of the message. This opportunity for instant communication by way of cellular telephone technology elevates text messages, at least on the spontaneity scale, beyond the level of an ordinary writing. *See Commonwealth v. DiMonte*, 427 Mass. 233, 239, 692 N.E.2d 45 (1998). Thus, we conclude that the spontaneity requirement is not undermined * * * by the fact that the statement is a writing in the form of a cellular telephone text message.

**{¶26}** We agree with this reasoning, and conclude that where the four elements of the *Dean* test are met, a text can indeed be a spontaneous utterance. We further find that the texts in this case were excited utterances.

**{¶27}** There was clearly a starting event (the rape). The texts, which obviously related to the event, were sent by C.C., the alleged victim, only minutes after the event, when she was still in an excited state. Further, the tone of the texts supports a determination that they were C.C.'s spontaneous reaction to the stress of the event. Accordingly, Young has not established that it was plain error for the trial court to admit the texts as excited utterances.

**{¶28}** Young also contends that the trial court erred in admitting the 911 call because it was hearsay not subject to the excited utterance exception. As with the texts, Young did not object to the admission of the 911 call at trial and, accordingly, we evaluate its admission for plain error.

**{¶29}** In the 911 call, C.C. told the dispatcher that "[t]he man snatches my clothes off and proceeds to put himself in me, with me telling him to get off." She said that "he did get to put himself inside me, but I did fight him off," and that when Young told her he hoped she would consider what happened to be a misunderstanding, she told him, "I'm sitting here telling you to get off me * * * I'm yelling at the top of my lungs, what's the misunderstanding, get off me!"

**{¶30}** We find no error in the trial court's admission of the 911 call because it related to the starting event (the rape); was made by C.C., who had firsthand knowledge

of the event, and it was made while she was under the stress of the excitement caused by the rape. Young contends, however, that because the call was made almost an hour after C.C. had texted her mother about the rape, she was no longer under the nervous excitement required to establish that her statements on the call were excited utterances. Even if that were true and the trial court erred in admitting the 911 call, we find only harmless error. Harmless error is "any error, defect, irregularity or variance which does not affect substantial rights * * *." Crim.R. 52(A). When the error does not affect a substantial right, it "shall be disregarded." *Id.*

{¶31} C.C.'s testimony was consistent with her statements on the call, and the call did not provide any significant new information. Accordingly, the 911 call was cumulative to other evidence, and Young was not unfairly prejudiced by the admission of the call.

{¶32} The first assignment of error is therefore overruled.

B.     Manifest Weight of the Evidence

{¶33} In his second assignment of error, Young contends that his convictions were against the manifest weight of the evidence because the trial court did not properly evaluate C.C.'s credibility and did not effectively resolve conflicting testimony.

{¶34} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92265, 2009-Ohio-4598, ¶ 12. The question to be answered is whether there is substantial evidence upon which the factfinder could reasonably conclude that all the elements of the crime have been proved

beyond a reasonable doubt. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 1997-Ohio-52, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶35} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able to view the witnesses, and use its observations of the witnesses' demeanor and gestures in weighing the credibility of the proffered testimony. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, choosing to believe all, none, or some of a witness's testimony. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶36} Young contends that C.C.'s testimony was not credible because she testified that the rape occurred around 5:14 p.m., she left Young's apartment after texting her mother at 5:24 p.m. that she had just been raped, and she then went to the street corner

where she called 911 and waited for the police. Young notes that the 911 call was not made until 6:21 p.m., however. He further points out that Rosa, the sexual assault nurse examiner, testified that C.C. told her that she had bathed post-assault and before her examination at Fairview Hospital, and that C.C. responded affirmatively when she was asked whether she "had food, drink, or chewed gum" since the assault. Young asserts that C.C.'s version of events failed to account for the hour after the assault before the 911 call was made and for these post-assault activities, which should have caused the trial judge to doubt the veracity of her testimony.

{¶37} He further notes that there was no physical evidence that tied him to the alleged assault. He points out that his DNA was not found on any of the swabs taken from C.C. during the rape kit examination, and that Rosa admitted that C.C.'s bruises were not necessarily indicative of rape and could have been there for several days prior to her examination. He also points out that although C.C. testified that she rushed out of Young's apartment immediately after the rape, both Houska and Rosa testified that neither C.C.'s clothes nor hair were disheveled or in disarray when they saw her. Further, Houska testified that he did not notice any physical injuries or bruises on Young when he arrested Young at his apartment on April 16, 2016, after conveying C.C. to the hospital. Young notes that his lack of injury is inconsistent with C.C.'s testimony that she kicked him twice in his face to cause him to fall backward off her.

{¶38} Young argues further that several other inconsistencies in C.C.'s testimony should have caused the trial judge to doubt her veracity. Specifically, C.C. testified that

the girlfriend whose house she intended to go to did not answer the door when she arrived there at 4:00 or 5:00 a.m. after leaving the hospital the morning after the assault, so she went somewhere else. C.C. could not recall where she went, however. Young questions how C.C. could remember the details of the alleged assault with such specificity but could not remember where she went right after leaving the hospital. Similarly, Young notes that C.C. testified that she returned to his apartment at one point to collect the rest of her belongings, but could not remember when she did so. Finally, he points out that when describing the alleged assault to Detective Evans, C.C. said that Young "was in [her] too long for [her] liking," a description inconsistent with the violent, forcible incident she described on direct examination.

{¶39} In finding Young guilty of rape and kidnapping, the judge explained that there was compelling evidence of a struggle involving C.C. The judge noted that her observation of Young indicated that he was "certainly capable" of engaging in a physical struggle, and when she specifically asked him during trial about his disabilities, he claimed only mental disabilities.

{¶40} The judge also noted that C.C.'s descriptions to the police, the sexual assault nurse examiner, and at trial regarding what had happened to her were very consistent. The judge found that there was not an unreasonable lapse of time from when the rape occurred until it was reported. And the judge noted that Young apologized to C.C. in his 6:18 p.m. text to her, presumably for the sexual assault. The judge found that Young's statement in the text that "you haven't shared a plan" could reasonably mean that Young

did not know that C.C. was planning to move out with a friend, and that he raped her because he wanted her out of his apartment. The judge noted that after the alleged rape, Young admitted to the police that he had been actively trying to constructively evict C.C. and had escalated his campaign to get her out. The judge found that this evidence, combined with C.C.'s text messages to her mother that Young had just raped her, C.C.'s text response to Young accusing him of sexually assaulting her, and Young's failure to deny C.C.'s accusation, demonstrated that Young was guilty beyond a reasonable doubt of rape and kidnapping.

{¶41} Upon review, we cannot conclude that Young's conviction was against the manifest weight of the evidence. As the trial court found, C.C.'s statements on the 911 call, to the police and the sexual assault nurse examiner, and at trial, were very consistent. The trial judge heard Rosa testify that C.C. told her that she had bathed after the rape; the judge undoubtedly weighed this testimony when considering whether C.C.'s version of the events was true.

{¶42} We agree that C.C.'s omission from her testimony that she bathed after the rape is curious, but we do not conclude that as a result the trial court should have necessarily concluded that all of her testimony was not credible. The text messages between her and her mother support her testimony that the rape occurred at approximately 5:14 p.m., and Young's subsequent text to C.C. at 6:18 p.m. stating "I'm sorry it had to end this way" can certainly be construed as an apology for raping her.

**{¶43}** And even if C.C. bathed or showered before leaving Young's apartment to go down to the street to call 911 and wait for the police (which would explain why she did not appear disheveled and why the 911 call was not made until 6:21 p.m.), she testified that she did not lie about the rape. Specifically, when asked at trial whether she called 911 and claimed Young raped her in order to "get back" at Young, C.C. responded, "That's ludicrous. That's playing with a person's life; no." As the trier of fact, the trial judge could weigh this testimony with the conflicts in C.C.'s testimony to determine her credibility.

**{¶44}** Moreover, if Young's version of the events is assumed to be true — that there was no rape and C.C. left his apartment around 4 p.m. that day because he videotaped her — C.C.'s testimony about the rape must necessarily be false, and the texts sent to her mother necessarily fabricated in order to frame Young. In light of C.C.'s adamant denial that she lied about the rape, however, we do not find that the judge lost her way in finding C.C.'s testimony about the rape more credible than Young's testimony denying the rape.

**{¶45}** C.C.'s statement to Detective Evans that Young "was in [her] too long for [her] liking" is not inconsistent with her description of the rape. C.C. testified that her statement meant that Young "shouldn't have been in there at all" and "he wouldn't get off me. He wouldn't get out of me. He shouldn't have never been there."

**{¶46}** Finally, although Young asserts that there was no DNA evidence that tied him to the rape, the DNA analyst testified that there was foreign DNA found on C.C.'s

inner right thigh, and Young could neither be included nor excluded from being a contributor of that foreign DNA. In light of C.C.'s testimony about the rape, the trier of fact could reasonably infer that Young's DNA was the foreign DNA in the mix. Moreover, the hand-print bruise on C.C.'s inner thigh corroborated her testimony that Young used one hand to hold her legs open during the rape. Although Rosa conceded that the bruises could have been there for several days, as factfinder, the judge was in the position to observe C.C.'s demeanor and evaluate the credibility of her testimony.

{¶47} Therefore, weighing the evidence and all reasonable inferences, considering the credibility of C.C. and Young, and resolving the conflicts in the evidence, we do not find that the judge clearly lost her way in convicting Young of rape and kidnapping. Accordingly, the second assignment of error is overruled.

{¶48} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., A.J., and
EILEEN T. GALLAGHER, J., CONCUR