*Michael Esposito v. State of Maryland*, No. 1148, Sept. Term, 2023. Opinion by Tang, J.

**CRIMINAL LAW – EVIDENCE – RES GESTAE – RES GESTAE; EXCITED UTTERANCES – ACTS AND STATEMENTS OF PERSON INJURED – IN GENERAL**

To make a statement admissible as an excited utterance, the proponent of the evidence must satisfy three requirements. "First, the proponent must establish that an exciting or startling event occurred, and that the declarant had personal knowledge of that event." *Curtis v. State*, 259 Md. App. 283, 315 (2023). Second, the statement sought to be admitted must "relate[] to the underlying startling event." *Id.* at 316. Third, the proponent must establish that the statement was spontaneous, meaning "that the declarant was still under the stress of the startling event at the time the statement was made and that the statement was not the product of reflective thought." *Id.* at 317.

Cell phone text message sent by the victim to her daughter—"Angela, I need you to call right away. Michael has hurt me."—was admissible. While the first sentence of the message was not hearsay (it was a command), the second sentence identifying her assailant was hearsay as it was being offered for the truth of the matter asserted, i.e., that the appellant had hurt the victim. However, the statement was admissible under the excited utterance exception to the hearsay rule.

The evidence demonstrated that the victim was still under the stress of the startling event when she texted her daughter. The victim sent the message at most eleven minutes after she was assaulted, and she was crying when she spoke to her daughter and son on the phone, minutes after she sent the message.

The sentences and punctuation in the text message did not compromise the spontaneity requirement. The tone and manner of the message, particularly when the victim expressed that she "need[ed]" her daughter to call her "right away," conveyed a sense of urgency and reinforced that the victim was under the stress or excitement of the startling event at the time she sent the text message. Md. Rule 5-803(b)(2).

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1148

September Term, 2023

_____

MICHAEL ESPOSITO

v.

STATE OF MARYLAND

_____

Zic,
Tang,
Moylan, Charles E.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: December 23, 2024

Following a bench trial in the Circuit Court for Anne Arundel County, Michael Esposito, the appellant, was convicted of involuntary manslaughter in the death of his grandmother, Betty Esposito ("Betty"), with whom he lived. He was sentenced to serve ten years of incarceration, all but six suspended, followed by five years' probation. The appellant presents two questions for our review, which we rephrase slightly:

    I.    Did the trial court commit reversible error by admitting Betty's statements in text messages and a 911 call under one or more hearsay exceptions enumerated under Maryland Rule 5-803(b)(1)–(4)?

    II.    Did the trial court commit reversible error by admitting doorbell camera footage of the appellant shouting at his neighbor on the evening of the incident?

For the following reasons, we hold that the court properly admitted most of Betty's statements and that the erroneous admission of other statements was harmless. We hold that the court erred in admitting the doorbell camera footage, but its admission was also harmless. Accordingly, we affirm the judgment of the circuit court.

## FACTS

On the evening of December 16, 2021, officers from the Anne Arundel County Police Department responded to Betty's home and found her unconscious. Betty, who was seventy-eight years old, was taken to the hospital, where diagnostic testing revealed a brain bleed necessitating surgical intervention. She never regained consciousness and died days later. An autopsy revealed that Betty died because of a blunt force injury to the left side of her head that caused significant bleeding on the right side of her brain. The medical examiner concluded that the manner of death was homicide.

Betty had two children: Christopher Esposito ("Chris") and Angela Terry ("Angela"). Angela is the mother of the appellant.

The State alleged that the appellant pushed Betty shortly before 7:00 p.m. on December 16, which led to the brain injury that resulted in her death. To support its case, the State presented evidence, including doorbell camera footage from Betty's home, communications between Betty and her two children, and a recorded 911 call that Betty made before she was found unconscious. The events unfolded in the following order.

**Doorbell Camera Footage**

As part of its investigation, police obtained doorbell camera footage from Betty's house. The first clip, recorded at **5:30 p.m.**, shows the appellant shrieking at a neighbor from the front walkway and porch, calling the neighbor "bitch. You (indiscernible) bitch." The appellant is seen gesturing emphatically and pacing back and forth on the walkway, screaming, "[M]y neighborhood, bitch," "[Y]ou Jewish bitch," and "[S]hut your motherfucking mouth. Really, come on, see you in the streets, bitch."

In the second clip, recorded at **6:50 p.m.**, the appellant's friend stepped onto the front porch from inside the house. The audio captured voices from within. Betty could be heard shouting, "Ow, you really hit me!" She then began to cry while the appellant could be heard speaking to her.

In the third clip, recorded at **6:57 p.m.**, the appellant's friend remained on the front porch while Betty went outside and walked down the front walkway to her car. The appellant followed her, saying, "I can never be heard, man," "You ruined my life," and

"I'm better than you, do you understand?" Betty replied, "No." The appellant then walked Betty back inside the house while his friend remained outside.

Once inside, the audio captured an argument between Betty and the appellant, in which he said, "(Indiscernible) what are you talking about? Shut the fuck up. I'm going to be heard again. I'm going to be heard again." Betty responded, "No, don't." Then, several loud banging noises were heard. The friend peered inside, at one point muttering to himself, "Goddamn, yo." The appellant then came back outside and said to his friend, "I killed her," after which both began to laugh.

### Betty's Communications with Her Children

At **7:01 p.m.**, Betty texted her daughter, "Angela, I need you to call right away. Michael has hurt me." She then called Angela at work and spoke to her. Angela described her mother as "upset" and crying, telling Angela, "Michael hurt me." Angela told her mother that she could not leave work, where she was a retail manager, and suggested that Betty call Chris instead.

At **7:03 p.m.**, Betty called her son, Chris. According to Chris, Betty was crying and "hysterical." She told Chris that the appellant had "either pushed her to the floor or thrown her to the floor." After the conversation ended, Chris tried to contact Angela directly but could not reach her.

At **7:17 p.m.**, Chris called 911, explained what Betty had told him, and asked someone to check on her. The dispatcher's notes from the call, reflected in the computer-aided dispatch ("CAD") report, stated there was a "FAMILY DISPUTE" between "MOTHER VS. HER GRANDSON," "UNSURE IF PHYSICAL . . . MOTHER WAS

3

POSS PUSHED TO THE GROUND," "NO WEA/CDS," "MALE 1/2 HAD BEEN DRINKING," "NO AMBO," and "MOTHER DIDN'T WANT HIM TO CALL."

At **7:30 p.m.**, Betty texted Chris the following:

[BETTY]:     Everything is fine. You do not need to come. I am sorry I called you. Love [heart emoji]

[BETTY]:     He is in bed now

Around the same time, Corporals Robert Logan and Zachary Seifert arrived at Betty's home for a welfare check.[1] Corporal Logan's body camera footage showed Betty answering the door, stepping onto the front porch, and saying without prompting, "Everything's fine." When Corporal Logan asked her, "What's going on?" she replied, "No, it's fine. Please." He continued by asking, "What happened?" to which she reiterated, "It's fine." Corporal Logan then asked whether she had called 911, and she stated that she had not, adding that her son must have called. The officers confirmed that she did not want their assistance and left. The entire interaction lasted just over a minute.

At **7:40 p.m.**, Chris texted Betty to ask if the police had come for a welfare check. The exchange, with time stamps, was as follows:

[**7:40 p.m.** CHRIS]:       Did the police come?

[**7:41 p.m.** CHRIS]:       I called them

[**7:41 p.m.** CHRIS]:       Welfare check

[**7:41 p.m.** CHRIS]:       Are u injured?

---

[1] The CAD report shows that dispatch received the call for service at 7:17 p.m. According to the report, Corporals Logan and Seifert were on scene at 7:30 p.m. and 7:32 p.m., respectively, and left the scene at 7:33 p.m.

4

| [**7:42 p.m.** BETTY]: | Yes and I sent them away. What is a welfare check |
| [**7:42 p.m.** CHRIS]: | To see if you are alright.! [sic] |
| [**7:43 p.m.** CHRIS]: | Do you want to come to my house for a while? |
| [**7:44 p.m.** BETTY]: | I am okay I am sorry I bothered you. |
| [**7:44 p.m.** CHRIS]: | Are you injured? |
| [**7:44 p.m.** CHRIS]: | Did the police talk to him? |
| [**7:46 p.m.** CHRIS]: | ? |
| [**7:46 p.m.** BETTY]: | No I want him to be able to go to work. He cannot have anything on record. |

### Betty's 911 Call

At **8:12 p.m.**, Betty called 911 from her cell phone. She told the operator, "I fell and my head is hurting all over." When asked if she was alone, she replied, "Yes." She told the operator she fell "a couple of hours ago, but my head is killing me." The operator asked how far she fell, and Betty replied, "[o]nto the floor." This exchange followed:

| [OPERATOR]: | Okay. What caused you to fall? |
| [BETTY]: | I was pushed. |
| [OPERATOR]: | Did you say you were pushed? |
| [BETTY]: | I just fell to the floor. |
| [OPERATOR]: | But did you say you were pushed? |
| [BETTY]: | No. |
| [OPERATOR]: | Okay. So what happened? Did you – were you dizzy or did you slip or? |

5

[BETTY]:        After.

[OPERATOR]:     What did you say?

[BETTY]:        After I fell – well –

[OPERATOR]:     I'm sorry?

[BETTY]:        After, I felt a lump on my head, I had a terrific headache.

[OPERATOR]:     Okay. But, ma'am, what I'm asking is what happened to make you fall?

[BETTY]:        Nervous.

[OPERATOR]:     Is there somebody there with you?

[BETTY]:        Yes.

[OPERATOR]:     Okay. Were you in some kind of dispute?

[BETTY]:        No.

[OPERATOR]:     Okay. Just stay with me, I've got the ambulance on the way, okay?

[BETTY]:        Okay.

[OPERATOR]:     Are you in a situation where you can't tell me what happened?

[BETTY]:        Yes.

[OPERATOR]:     . . . Now, when you fell, did you hit your head?

[BETTY]:        Yes.

[OPERATOR]:     Okay. Are you bleeding?

[BETTY]:        No.

* * *

6

| [OPERATOR]: | Okay. Now, does this other person know that you're calling for an ambulance? |
|---|---|
| [BETTY]: | Yes. |
| [OPERATOR]: | Okay. But they don't know that I have pretty much figured out what happened, right? |
| [BETTY]: | Right. |
| [OPERATOR]: | Okay. Is it your husband? |
| [BETTY]: | No. |

\* \* \*

| [OPERATOR]: | Okay. Is it somebody that lives with you, like a significant other? |
|---|---|

\* \* \*

| [BETTY]: | My grandson. |
|---|---|
| [OPERATOR]: | What did you say? |
| [BETTY]: | I don't have a [inaudible.] |
| [OPERATOR]: | Okay. Is it somebody related to you? |
| [BETTY]: | Yes. |

\* \* \*

| [OPERATOR]: | So this person that pushed you, is it a male? |
|---|---|
| [BETTY]: | Yes. |

At **8:21 p.m.**, Corporals Logan and Seifert responded to Betty's house for the second time. This time, the appellant answered the door and was crying. Corporal Logan entered the home and found Betty unconscious.

7

Fire and rescue personnel transported Betty to the hospital. According to the report prepared by the primary paramedic on the scene, the initial 911 call was made by Betty's son (Chris), who advised that Betty had called him and said that her grandson had pushed her.

**Appellant's Arrest**

The appellant was arrested and transported to the Anne Arundel County Detention Center. Afterward, Corporal Logan called Angela to inform her of the incident. His body-worn camera captured the call, during which Angela could be heard over speakerphone saying, "I guess [the appellant] pushed her and she fell in the foyer . . . ."

Early the next day, the appellant called Angela from the detention center. During the recorded call, the appellant asked if Betty was okay. Angela informed him that Betty was in the intensive care unit. The appellant responded, "You know I didn't touch her." Angela replied, "She say [sic] you pushed her." The appellant denied pushing Betty, explaining that she "came at [him] and she fell, she slipped." Angela countered, "Well, I don't know what to say, that's what she said."

The appellant claimed that he caught Betty and that she "whiplashed her head back." Later in the call, the appellant acknowledged that he and Betty argued. He explained that Betty was upset with him, got "overwhelmed," and she was "talking shit." He continued to deny pushing or hurting her, stating that Betty "was trying to come at [him, and he] was just moving out of the way, kind of."

8

**PROCEDURAL BACKGROUND**

The appellant was charged by indictment with second-degree murder, and he elected a bench trial.[2] Before trial, he filed a motion *in limine* to suppress statements made by Betty orally and through text messages to her children (Chris and Angela). He also sought to suppress statements made by Betty during the 911 call as well as the footage from the doorbell camera.

After a hearing on the motion, the court issued an order ruling that the above statements made by Betty in text messages to her children and during her recorded 911 call were hearsay. However, the court concluded that the statements were admissible under one or more of the following exceptions to the hearsay rule: Maryland Rule 5-803(b)(1) (present sense impression), (b)(2) (excited utterance), (b)(3) (then-existing mental, emotional, or physical condition), and (b)(4) (statements for purposes of medical diagnosis or treatment).[3] The court reserved ruling on the relevance of the doorbell camera footage until trial.[4]

---

[2] The appellant also was indicted on charges of abuse of a vulnerable adult resulting in death and abuse of a vulnerable adult who is a family member. The State nol prossed those charges on the first day of trial.

[3] The court's order did not address oral statements made by Betty to her children over the phone. During trial, the defense objected to these statements for the same reasons outlined in the motion *in limine*, but the court overruled the objections. The admissibility of these oral statements is not at issue in this appeal.

[4] The court rejected a separate argument advanced by the appellant at the suppression hearing based upon the bill of particulars. That argument is not before us on appeal.

The case was tried before the circuit court over three days, and the evidence presented has been summarized above. Relevant to this appeal, the court admitted, over objection, the text messages exchanged between Betty and her children, the recorded 911 call made by Betty, and the doorbell camera footage.

The court admitted, over objection, the recorded call during which Angela informed Corporal Logan that Betty had told her that the appellant pushed her, causing her to fall. This was admitted as substantive evidence under Maryland Rule 5-802.1(a)(3) and *Nance v. State*, 331 Md. 549, 569 (1993) (holding that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt under certain circumstances). It admitted, without objection, the CAD reports, Corporal Logan's body camera footage showing the initial welfare check and subsequent response at the home, the paramedic's report, and the appellant's recorded jail call with Angela.

At the conclusion of the bench trial, the court considered two modalities of second-degree murder. One modality is "the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result." MPJI-Cr 4:17(C). The second modality, second-degree "depraved heart" murder, is the killing of another person while acting "with an extreme disregard for human life."[5] MPJI-Cr 4:17.8(A).

---

[5] This means that the defendant's conduct created a very high degree of risk to the victim's life, and the defendant, conscious of such risk, acted with extreme disregard of the life-endangering consequences. *See* MPJI-Cr 4:17.8(A).

The court also considered two modalities of involuntary manslaughter. Involuntary manslaughter can be proved by showing that the defendant acted in a grossly negligent manner[6] or while committing an unlawful act that resulted in the victim's death. *See* MPJI-Cr 4:17.8(B)–(C).

Ultimately, the court found the appellant not guilty of second-degree murder but guilty of manslaughter.

We include additional facts in our discussion of the issues as necessary.

## DISCUSSION

## I.

## Hearsay Evidence

The appellant contends that the circuit court erred in admitting Betty's text messages to her children and certain statements from the 911 call. Before examining the disputed evidence, we provide an overview of hearsay, relevant exceptions to the hearsay rule, and harmless error.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Md. Rule 5-801(a). "A 'declarant' is a person who makes a statement." Md. Rule 5-801(b).

---

[6] "Grossly negligent means that the defendant, while aware of the risk, acted in a manner that created a high risk to, and showed a reckless disregard for, human life." MPJI-Cr 4:17.8(B).

To determine whether the proffered evidence is hearsay, we first determine if it contains an out-of-court statement and, if so, identify the declarant. *See* 6A Lynn McLain, *Maryland Evidence: State and Federal* § 801:1, at 176 (3d ed. 2013) ("McLain"). Second, we identify the assertions, if any, contained in the out-of-court statement by determining what the declarant was asserting at the time the declarant made the statement. *Id.*; *see Richardson v. State,* 324 Md. 611, 621 (1991) (explaining that the trial judge must examine the nature of the out-of-court statements).

Third, we examine the purpose for which the statement is being offered. McLain § 801:7, at 176–77; *see Richardson*, 324 Md. at 621 (explaining that the trial judge must also examine what the out-of-court statements are offered to prove). If the proponent seeks to introduce the statement to prove the truth of the matter asserted in it, the statement constitutes hearsay. *See* Md. Rule 5-801(c). But "a statement that is offered for a purpose other than to prove its truth is not hearsay at all." *Hardison v. State*, 118 Md. App. 225, 234 (1997).

An out-of-court statement is considered to have been offered to prove the truth of the matter asserted if it would "only have any probative value . . . if the out-of-court declarant was both sincere and factually accurate as to the fact(s) he was asserting at the time he made the statement." McLain § 801:7, at 236; *see Handy v. State*, 201 Md. App. 521, 540 (2011) (quoting McLain, § 801:1(C) at 14–15 (2d ed. 2001)). The relevant inquiry is, "[D]oes a fact asserted in the out-of-court statement have to [have] been sincerely and accurately stated, in order for the out-of-court statement to help to prove what it is offered to prove?" *See State v. Young*, 462 Md. 159, 170 (2018) (quoting, in part, McLain § 801:7,

12

at 235). If the answer is yes, the statement is hearsay; otherwise, it is nonhearsay and consequently not subject to the hearsay rule. McLain § 801:7, at 235.

Hearsay is inadmissible except as otherwise provided by the Rules or an applicable constitutional provision or statute. Md. Rule 5-802; *see Bernadyn v. State*, 390 Md. 1, 8 (2005) ("Hearsay . . . *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule . . . or is 'permitted by applicable constitutional provisions or statutes.'" (quoting Md. Rule 5-802)). "Whether the trial court properly admitted a particular statement under an exception to the rule against hearsay often requires separate inquiries with divergent standards of review." *Curtis v. State*, 259 Md. App. 283, 298 (2023). "We review for clear error the trial court's preliminary findings as to the factual circumstances under which the statement was made." *Id*. "However, the trial court's holding as to whether those circumstances, as well as the content of the statement itself, render it admissible under a hearsay exception is a legal determination that we review without deference to the trial court's determination." *Id*.

The four exceptions under Maryland Rule 5-803(b) relevant here are present sense impressions, under subsection (b)(1); excited utterances, under subsection (b)(2); statements of then-existing mental, emotional, or physical condition, under subsection (b)(3); and statements for purposes of medical diagnosis or treatment, under subsection (b)(4).

## A.

## Present Sense Impression

Maryland Rule 5-803(b)(1) provides an exception to the hearsay rule for "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

"[F]or a statement to be admissible as a present sense impression, there is no requirement that the declarant have been startled, excited, or upset about the event perceived." *Mason v. State*, 258 Md. App. 266, 291 (2023) (emphasis omitted) (quoting McLain § 803(1):1, at 435). To be admissible as a present sense impression, a "statement must have been made either during the declarant's perception of [an] event or condition in question or immediately afterwards. Anything more than a slight lapse of time between the event and the statement will make the statement inadmissible." *Id*. (emphasis omitted) (quoting McLain § 803(1):1, at 435–36 (emphasis and footnote omitted)). As Chief Judge Joseph F. Murphy, Jr. explained:

> A declarant who is speaking in past tense is unlikely to be stating a present sense impression. The rule against hearsay is based upon our belief that the factfinder should observe each witness in order properly to evaluate perception, memory, narration, and sincerity. The present sense impression becomes inadmissible hearsay when the declarant stops talking about what he or she is now observing and starts talking about what was observed at some time in the past.

Joseph F. Murphy, Jr. & Erin C. Murphy, *Maryland Evidence Handbook* § 803[B], at 399 (5th ed. 2020); *see, e.g.*, *Morten v. State*, 242 Md. App. 537, 557–58 (2019) (statement made during 911 call following a shooting indicating that police were "checking the rear" of the location and "going the wrong way" was admissible as a present sense impression,

14

but statement in subsequent 911 calls in which caller described events that occurred minutes earlier was inadmissible under that exception).

## B.

### Excited Utterance

Maryland Rule 5-803(b)(2) provides an exception to the hearsay rule for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This differs from the present sense impression exception in that "the time within which an excited utterance may be made is measured by the duration of the stress caused by the exciting event," whereas statements of present sense impression "may be made only while or 'immediately after' the declarant 'perceived' the event or condition." 2 Robert P. Mosteller *et al.*, *McCormick on Evidence* § 271, at 384 (8th ed. 2020) ("McCormick") (footnote omitted); *Booth v. State*, 62 Md. App. 26, 34 (1985) (quoting McCormick § 272, at 862 (3d ed. 1984)). "The rationale behind the excited utterance exception is that the startling event suspends the declarant's process of reflective thought, thereby reducing the likelihood of fabrication." *Davis v. State*, 125 Md. App. 713, 716 (1999).

To make a statement admissible as an excited utterance, the proponent of the evidence must satisfy three requirements. "First, the proponent must establish that an exciting or startling event occurred, and that the declarant had personal knowledge of that event." *Curtis*, 259 Md. App. at 315. Second, the statement sought to be admitted must "relate[] to the underlying startling event." *Id.* at 316.

15

Third, the proponent must establish that the statement was spontaneous, meaning "that the declarant was still under the stress of the startling event at the time the statement was made and that the statement was not the product of reflective thought." *Id.* at 317. The trial court looks at "the declarant's subjective state of mind" to determine whether "under all the circumstances, [the declarant is] still excited or upset to that degree." *Gordon v. State*, 431 Md. 527, 536 (2013) (quoting McLain § 803(2):1, at 447). The court considers such factors as "how much time has passed since the event, whether the statement was spontaneous or prompted, and the nature of the statement, such as whether it was self-serving." *Id.* For instance, "one primary consideration is the time between the startling event and the declarant's statement. Time, however, is not alone determinative. Thus, the fact that the statement at issue occurred so close in time to the startling event is not dispositive." *State v. Harrell*, 348 Md. 69, 77 (1997) (citation omitted). "In addition, that the statement was made in response to an inquiry . . . is not controlling. It, however, may be some indication of reflective thought which makes it less likely that the statement falls within the excited utterance exception." *Id.* (citation omitted).

These factual determinations require deference from appellate courts. *Gordon*, 431 Md. at 536–37. Thus, the standard of review for a trial court's admission or exclusion of hearsay under the excited utterance exception is abuse of discretion. McLain § 803(2):1, at 456. While "the trial court's ultimate determination of whether particular evidence is hearsay or whether it is admissible under a hearsay exception is owed no deference on appeal, . . . the factual findings underpinning this legal conclusion necessitate a more deferential standard of review." *Gordon*, 431 Md at 538.

16

# C.

## Then-Existing Mental, Emotional, or Physical Condition

Rule 5-803(b)(3) provides that a hearsay statement of the declarant's then-existing state of mind is not excluded by the hearsay rule. The exception allows the admission of the following hearsay:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Professor McLain explains this exception as it applies to a declarant's then-existing state of mind (emotion, feeling, etc.):

> When the declarant's state of mind is relevant (apart from the accuracy of the declarant's memories or beliefs that caused that state of mind), the declarant's assertion as to his state of mind is admissible to prove that the declarant had that particular state of mind at the time of the out-of-court statement (emotion, feeling, etc.) and therefore as circumstantial evidence that the declarant also had it at another time relevant to the case. A murder defendant's statement, "I hate Victim," would be admissible to prove that that hatred also existed at the time Victim was murdered. This evidence would be relevant to the defendant's motive and intent to kill Victim.

> Such direct assertions by the declarant as to the declarant's state of mind are admissible under this hearsay exception. Statements that provide circumstantial evidence of the declarant's state of mind (such as "Victim deserves to die," offered in the same murder trial) are not excluded by the hearsay rule, but this is because they are nonhearsay, as they are also not offered to prove the truth of the matter asserted by the declarant when making the out-of-court statement. Nonhearsay statements that are admissible as circumstantial evidence of the declarant's state of mind, rather than to prove the truth of the matter asserted by the declarant, often are mistakenly admitted as falling within the hearsay exception for state of mind.

17

McLain § 803(3):1, at 466–67 (emphasis and footnotes omitted); *see Edery v. Edery*, 193

Md. App. 215, 234 (2010) (quoting, in part, McLain § 803(3):1 at 198–99 (2d ed. 2001)).

Professor McLain also explains the exception as it applies to a declarant's physical

condition or sensation:

> As to present physical sensations, this subsection of the Rule is a subcategory of Md. Rule 5-803(b)(1), present sense impressions.
>
> Md. Rule 5-803(b)(3) makes no restriction as to whom the statement is made, or for what purpose. Statements of then existing physical condition are often self-serving: for example, a husband may complain to his wife, or an employee to an employer, that his back hurts and he cannot do a task he has been asked to do. The statements are nonetheless admissible: no one could have better perception of one's own physical sensations than oneself, and there is no memory problem when one describes one's present physical condition. The fact-finder, in evaluating the statement, is trusted to take into account any motive that the declarant may have had to be insincere. This hearsay exception does not extend to backward looking statements of memory or belief, e.g., as to what caused the condition.

*Id.* § 803(3):2, at 479 (footnotes omitted).

## D.

## Statements for Purposes of Medical Diagnosis or Treatment

Rule 5-803(b)(4) provides that the following statements are not excluded by the

hearsay rule:

> Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

The rationale underlying this exception is that such statements are "apt to be sincere

when made with an awareness that the quality and success of the treatment may largely

depend on the accuracy of the information provided[.]" *State v. Coates*, 405 Md. 131, 142 (2008) (citation omitted). "There is no requirement that the witness be a treating physician holding a medical degree in order for the exception to apply." *Griner v. State*, 168 Md. App. 714, 745 (2006).

## E.

## Harmless Error

In *Dorsey v. State*, 276 Md. 638, 659 (1976), the Supreme Court of Maryland discussed harmless error:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

The burden is on the State to show that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case. *Perez v. State*, 420 Md. 57, 66 (2011) (citations omitted).

Our appellate courts "will not find reversible error on appeal when objectionable testimony is admitted if the essential contents of that objectionable testimony have already been established and presented to the jury *without objection* through the prior testimony of other witnesses." *Yates v. State*, 429 Md. 112, 120 (2012) (citation omitted); *Robeson v. State*, 285 Md. 498, 507 (1979) ("The law in this State is settled that where a witness later gives testimony, *without objection*, which is to the same effect as earlier testimony to which an objection was overruled, any error in the earlier ruling is harmless."); *see also*

*McClurkin v. State*, 222 Md. App. 461, 485 (2015) (erroneously admitted phone call was harmless where the hearsay within was cumulative to properly admitted evidence).

With these principles in mind, we turn to the challenged evidence.

**F.**

**Analysis**

**i. Betty's Text Message to Angela**

The appellant argues that the circuit court erred in admitting Betty's text message to Angela at 7:01 p.m., which stated, "Angela, I need you to call right away. Michael has hurt me." He argues that the message was inadmissible under the above exceptions to the hearsay rule.

Betty's text message to Angela has two components. The first component—"Angela, I need you to call right away."—is a command. Generally, out-of-court commands and orders are not factual assertions because they can neither be true nor untrue. *Wallace–Bey v. State*, 234 Md. App. 501, 539 (2017); *see, e.g.*, *Holland v. State*, 122 Md. App. 532, 544 (1998) ("The out-of-court command, 'Stop!' can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem."); *Burgess v. State*, 89 Md. App. 522, 537–38 (1991) (instructions and warnings such as "Don't do that, or else" and "Watch your step" are not assertive). Thus, the first part of the message is nonhearsay.

The second component of the statement—"Michael has hurt me."—is an assertion offered for the truth of the matter asserted, i.e., the appellant hurt Betty. This statement was admissible as an excited utterance. The appellant does not dispute that the statement meets

20

the first two requirements for an excited utterance, namely, that the push causing Betty to fall and hit her head was a startling event of which she had personal knowledge, and that her text to Angela was about that event. Instead, the appellant focuses his challenge on the third requirement of spontaneity. He argues that the tone and manner of the entire message do not reflect spontaneity because it consists of sentences and includes punctuation.

While "[t]he act of writing inherently and necessarily involves reflection, deliberation, and conscious thought," "[t]ext messages and other digital communications occupy a place somewhere in between oral utterances and most writing, and courts have recognized that a court might well find that the circumstances under which such a message was written can establish the required spontaneity." Clifford S. Fishman, *Jones on Evidence* § 28:19, at 651, 903–04 (7th ed. 2000 & Supp. 2023).

Because no Maryland case has addressed the spontaneity requirement as applied to text messages, we look to courts in other jurisdictions. In *Lorraine v. Markel American Insurance*, 241 F.R.D. 534 (D. Md. 2007), Judge Paul W. Grimm considered the application of the excited utterance exception (and present sense impression exception) to text messages and other digital communications:

> The prevalence of electronic communication devices, and the fact that many are portable and small, means that people always seem to have their laptops, PDA's, and cell phones with them, and available for use to send e-mails or text messages describing events as they are happening. Further, it is a common experience these days to talk to someone on the phone and hear them typing notes of the conversation on a computer as you are talking to them. For these reasons, Rules 803(1) and (2) may provide hearsay exceptions for electronically stored communications containing either present sense impressions or excited utterances.

*Id.* at 569.

In *Commonwealth v. Mulgrave*, 33 N.E.3d 440 (Mass. 2015), the Supreme Judicial Court of Massachusetts held that a murder victim's text message to her son—"He [the victim's husband] is threatening to kill me I am scared he said if I pick up the phone he will kill me."—was an excited utterance. *Id.* at 444, 449. Six minutes later, she called 911 and frantically reported that her husband was stabbing her. *Id.* at 444. The victim died from her wounds. *Id.*

The Supreme Judicial Court explained that "[b]ecause a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before we could conclude that the writing qualified as a spontaneous exclamation." *Id.* at 447 (quoting *Commonwealth v. DiMonte*, 692 N.E.2d 45, 50 (Mass. 1998)). The court clarified that the "heightened indicia of reliability requirement . . . does not impose an additional test in the spontaneous utterance analysis." *Id.* at 447. "Rather, it is intended only to ensure that a writing, which generally is a product of reflection, meets the spontaneity requirement. Thus, although we examine a writing more closely on the element of spontaneity, the analysis is the same as for an oral statement." *Id.*

In assessing the spontaneity requirement, the court considered "the circumstances of the statement, including the temporal relation between the event and the statement, and the tone and manner of the declarant." *Id.* Because the statement was written, the court also considered whether and to what extent the requisite spontaneity was compromised by this method of communication. *Id.* at 448.

22

The court concluded that the circumstances of the statement, although in the form of a text message, were entirely consistent with spontaneity. *Id.* This was because the victim called 911 to report that the defendant was stabbing her six minutes after the text message to her son reporting that the defendant was "threatening to kill" her. *Id.*

Moreover, the requisite spontaneity was not compromised by the method of communication. The court explained that the circumstances under which the text message was sent adequately compensated for the limitations inherent in a writing and met the spontaneity test. *Id.* The court reiterated Judge Grimm's observations regarding the prevalence of text messages, explaining that the spontaneity requirement is not necessarily diminished just because communications are in text message form:

> Cellular telephone text messages are a unique form of written communications in that they allow for instant communication in much the same way as oral communications. The cellular technology that allows for the sending and receiving of a text message instantly, often as a substitute for oral expression, diminishes the concern about spontaneity that might arise with other more deliberative modes of written communication. Further, the growth of cellular telephones has made text messaging and other types of written electronic statements ubiquitous forms of rapid communication. For a person proficient in the use of the cellular telephone technology, sending a text message may involve no more effort than verbalizing a thought, feeling, or emotion in response to an event. A cellular telephone user may choose between verbal and written communication without sacrificing immediacy in the communication of the message. This opportunity for instant communication by way of cellular telephone technology elevates text messages, at least on the spontaneity scale, beyond the level of an ordinary writing. Thus, we conclude that the spontaneity requirement is not undermined in this case by the fact that the statement is a writing in the form of a cellular telephone text message.

*Id.* (footnotes and citation omitted); *id*. at n.5 (citing *Lorraine*, 241 F.R.D. at 569).

The court explained that the tone and manner of the declarant, as evidenced by the writing itself, supported a determination that the statement was spontaneous. *Id.* at 449. This was because the victim's message was one sentence without any punctuation and related to the circumstances of the threat to the victim's safety and her fearful reaction to that threat. *Id.* Thus, the court was persuaded that the circumstances of the statement, the tone and manner of the statement, and its timing established the spontaneity requirement. *Id.*

Courts in other jurisdictions have also applied the excited utterance exception to text messages and have analyzed the spontaneity requirement in the same manner as oral statements. *See Evans v. State*, 690 S.W.3d 871, 876–79 (Ark. Ct. App. 2024) (text messages between victim and friend within hour and a half after incident were admissible under excited utterance exception in prosecution for rape because the fact that victim was pleading for help and told friend that she did not know what to do indicated she was still under the stress and excitement caused by the event when she sent the text messages); *State v. Swing*, 98 N.E.3d 828, 849 (Ohio Ct. App. 2017) (text messages sent by victim to friend describing alleged sexual assault by defendant, who was in the same car as victim at the time of sending the messages, fell within the excited utterance exception to the hearsay rule, where evidence showed that victim was nervous, upset, in a state of shock, scared, distressed, and not acting like her usual self shortly after car ride with defendant); *United*

*States v. Hadden*, No. 23-6822-CR, 2024 WL 4456203, at *3 (2d Cir. Oct. 10, 2024)[7] (text message sent by victim to friend and boyfriend immediately following sexual abuse by gynecologist were properly admitted as excited utterances because they were sent when victim still was in a "state of shock"); *United States v. Stackhouse*, No. 22-30177, 2024 WL 3201934, at *1 (9th Cir. June 27, 2024) (text messages sent by victim to her cousin within minutes of being assaulted were properly admitted under the excited utterance exception where cousin testified that victim was crying and visibly upset a few minutes after she sent the messages); *United States v. Gortzig*, No. 202100064, 2022 WL 3907762, at *5 (N-M. Ct. Crim. App. Aug. 31, 2022) (per curiam)[8] (text messages sent by victim of sexual assault to her friend beginning less than ten minutes after she was assaulted while she remained under the influence of the event were admissible as excited utterances).

Considering that text messages have become ubiquitous in the modern day as a substitute for oral communications, we have no difficulty concluding that text messages may qualify under the excited utterance exception provided they meet the requirements

---

[7] "It is the policy of this Court to allow the citation of unreported opinions from federal courts and courts of other states as long as the jurisdiction where it was issued would allow its citation for persuasive value in its courts." *Critzos v. Marquis*, 256 Md. App. 684, 695 n.4 (2023). Federal Rule of Appellate Procedure 32.1(a) provides that "[a] court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, or other written dispositions that have been: (i) designated as 'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like; and issued on or after January 1, 2007." *Id.* (quoting Fed. R. App. P. 32.1(a)). Accordingly, this Court may consider unpublished federal opinions issued on or after January 1, 2007, for their persuasive value. *Id.*

[8] The United States Navy-Marine Corps Court of Criminal Appeals Rules of Appellate Procedure permit the citation of that court's unreported per curiam decisions as persuasive authority. Navy-Marine Crim. App. R. App. P. 30.2(b).

under Rule 5-803(b)(2). As stated, the spontaneity requirement examines whether the statement resulted from reasoning and reflection or a spontaneous response to the exciting event. Just as a trial court considers the timing of a statement or whether a statement was made in response to an inquiry, the court would also evaluate whether a writing, such as a text message, shows some indication of reflective thought that makes it less likely that the statement falls within the excited utterance exception. *See Harrell*, 348 Md. at 77; *accord Mulgrave*, 33 N.E.3d at 447; *see also, e.g.*, *Green v. State*, 81 Md. App. 747, 755–56 (1990) (writing the license plate number of a get-away car on a folder was not an excited utterance: "Although caught . . . in the middle of a combat situation, [the declarant] appears to have responded with admirable coolness and deliberation first in observing and then in memorializing a vital clue.").

The appellant acknowledges that some text messages can constitute excited utterances, but he argues that the text message here does not qualify. He claims that unlike in *Mulgrave*, the "tone and manner" of Betty's text message to Angela fails to meet the spontaneity requirement because it consists of "multiple sentences and punctuation." The flaw in this argument is that it focuses on one aspect while disregarding other factors that convey Betty was still experiencing excitement or stress from the startling event when she sent the text to Angela. *See Gordon*, 431 Md. at 536 (explaining that when determining whether a statement constitutes an excited utterance, the trial court assesses "the declarant's subjective state of mind" to determine whether "under *all the circumstances*, [the declarant is] still excited or upset to that degree" (emphasis added)).

26

There was ample evidence that Betty was still under the stress of the startling event when she texted Angela. The evidence showed that Betty experienced the startling event between 6:50 and 6:57 p.m., meaning she sent the text at most eleven minutes after being hurt. *See, e.g.*, *Davis*, 125 Md. App. at 716–17 (victim was still under the influence of a startling event when she made a statement to a police officer "a scant fifteen minutes" after she was assaulted). Betty cried when she spoke to Angela after sending the text at 7:01 p.m. She continued to cry when she talked to Chris two minutes later. The evidence demonstrated that Betty remained agitated and upset when she texted Angela.[9] The sentences and punctuation in the text message did not compromise the spontaneity requirement. The tone and manner of the message, particularly when Betty expressed that she "need[ed]" Angela to call her "right away," conveyed a sense of urgency and reinforced that Betty was under the stress or excitement of the startling event at the time she sent the message.

The circuit court did not err in admitting Betty's text message to Angela for the reasons stated. The first part of the message, "Angela, I need you to call me right away," was not hearsay, and the second part, "Michael has hurt me," was admissible under the excited utterance exception to the hearsay rule.

---

[9] The appellant suggests that the fact Betty usually cried when calling Angela weighed against the spontaneity requirement. We are not persuaded by the argument. Although Angela testified that it was normal for Betty to cry during their calls, she also said that Betty's demeanor during this particular call was not her "normal baseline." Angela described Betty as having a "different vibe" than normal.

27

### ii. Betty's Text Messages to Chris

The appellant argues that the circuit court erred in admitting Betty's text messages to Chris. He argues that the messages did not fall under any hearsay exceptions listed above and thus were inadmissible. We analyze each message in detail.

### a. Text Messages Sent at 7:30 p.m.

After Chris called 911, Betty sent Chris the following messages at 7:30 p.m.:

[BETTY]:    Everything is fine. You do not need to come. I am sorry I called you. Love [heart emoji]

[BETTY]:    He is in bed now

For purposes of analysis, we divide these messages into four parts. The first part is the statement, "Everything is fine," which is nonhearsay. This statement was offered not for its truth but to prove that Betty was downplaying her injury to protect the appellant from getting into trouble. The prosecutor confirmed this in his opening statement, explaining that when Betty sent the text messages to Chris, she was attempting to "protect the individual who did this to her" when "she tells [Chris], '*Everything's fine*. I don't want [the appellant] to get in trouble.'" (emphasis added). Even if the statement were offered for its truth, i.e., that Betty was indeed "fine," it would have been admissible as a statement of her then-existing mental and physical state.

The second part of the message, "You do not need to come," is not an assertion; it cannot be true or untrue. Therefore, it is not hearsay.

The third part of the message, "I am sorry I called you. Love [heart emoji,]" arguably was not offered to prove the truth of the matter asserted. Rather, it seemed to reinforce

Betty's earlier message that "Everything was fine" and her wish to avoid getting the appellant into trouble. Even if it was offered for its truth, i.e., that Betty was remorseful for having troubled Chris, it was admissible as a statement of her then-existing mental state. *See, e.g.*, *United States v. Samaniego*, 345 F.3d 1280, 1282 (11th Cir. 2003) ("An apology is evidence of a then-existing state of mind or emotion: remorse."); *State v. John L.*, 856 A.2d 1032, 1040 (Conn. App. Ct. 2004) (defendant's expression of regret and remorse in letters was admissible under exception for then-existing mental state).

The fourth part of the message, "He is in bed now," assuming it was offered for its truth, described the appellant's location. It was admissible as a present sense impression. *See, e.g.*, *Morten*, 242 Md. App. at 557 (statement made by 911 caller indicating that police were "checking the rear" of the location and "going the wrong way" was admissible as a present sense impression); *State v. Dillard*, 55 So. 3d 56, 63 (La. Ct. App. 2010) (declarant's statement giving suspect's current location was a present sense impression).

### b. Text Message Sent at 7:42 p.m.

After the police completed the welfare check, Chris followed up with Betty. He asked her if the police had come by. Betty's response at 7:42 p.m. was, "Yes and I sent them away. What is a welfare check[?]" We analyze this message in two parts.

The first part of the message, "Yes and I sent them away," was hearsay offered to prove the truth of the matter asserted, i.e., that the police came, and Betty sent the police away. It does not fall within any of the exceptions to the hearsay rule. Thus, the court erred

29

in admitting it.[10] However, this error was harmless because the evidence was cumulative; Corporal Logan's body camera footage from the welfare check, admitted without objection, showed the officer's arrival and Betty sending them away. Therefore, the appellant could not have been prejudiced by the erroneous admission of Betty's text message, which conveyed the same information.

The second part of the message, "What is a welfare check[?]," was a question that did not assert anything and could not have been offered to prove its truth. *See Garner v. State*, 183 Md. App. 122, 137–39 (2008) (explaining how non-assertive questions are non-hearsay). It was not hearsay.

### c. Text Message Sent at 7:44 p.m.

Chris asked if Betty wanted to come to his house for a while. Betty's response at 7:44 p.m. was, "I am okay I am sorry I bothered you." The first part of the statement, "I am okay," like the statement "Everything is fine," was nonhearsay. It was not offered to prove the truth of the matter asserted. Even if it were offered for its truth, i.e., that Betty was indeed "okay," it would fall under the exception for then-existing mental, emotional, or physical condition.

The second part, "I am sorry I bothered you," like the statement "I am sorry I called you," is also nonhearsay. It was not offered to prove the truth of the matter asserted. Even if it were offered for its truth, i.e., that Betty felt remorse for having troubled Chris, the

---

[10] To the extent it was thought the statement fell under the exception for a present sense impression, the statement described an event that had occurred about nine minutes earlier, which would have removed it from the reach of that exception.

statement would be admissible as a statement of then-existing mental or emotional condition.

### d. Text Message Sent at 7:46 p.m.

In the final text message, Chris asked if the police had spoken to the appellant. Betty responded at 7:46 p.m. with, "No I want him to be able to go to work. He cannot have anything on record." Her reply, "No," asserted that the police did not speak to the appellant. It was hearsay, and no exception to the hearsay rule applied. However, the error in admitting it was harmless because it was cumulative to other unobjected-to evidence from Corporal Logan's body camera footage, which showed that the appellant did not talk to the police.

The remainder of the message, "I want him to be able to go to work. He cannot have anything on record," was nonhearsay. It was not offered to prove the truth of the matter asserted but intended to explain why Betty sent the police away. This was confirmed in opening and closing statements, during which the prosecutor highlighted that Betty turned the police away to protect the appellant.

Even if this message constituted hearsay, it would be admissible under the exception for her then-existing mental state. It expressed Betty's desire to keep the appellant's criminal record clean so that his ability to work would not be compromised. *See, e.g.*, *Edery*, 193 Md. App. at 237 (hearsay statements that mother may have made expressing her wishes concerning final disposition of her body were admissible under the state of mind exception); *Copeland v. State*, 196 Md. App. 309, 313–15 (2010) (victim's statements to police officer that she was fearful that if she talked to police, the defendant might hurt her

31

family were admissible under the state of mind exception to show her fear of the defendant).

### iii. Betty's 911 Call

The appellant argues that the circuit court erred in admitting certain statements made by Betty during her 911 call, claiming that they constitute hearsay and do not fall within any of the hearsay exceptions.[11] He acknowledges that much of the 911 call was admissible as statements for the purpose of medical diagnosis or treatment, including Betty's statement that she was pushed or fell. He maintains, however, that the statements about the identity and presence of the person who allegedly pushed her do not fall under any hearsay exception cited by the court. As best we understand, the statements being challenged are:

> [OPERATOR]:　　**Is there somebody there with you?**
>
> [BETTY]:　　**Yes.**
>
> * * *
>
> [OPERATOR]:　　**Are you in a situation where you can't tell me what happened?**
>
> [BETTY]:　　**Yes.**
>
> * * *

---

[11] The State argues that the appellant failed to preserve his claims of error because, at the suppression hearing, he contended that the 911 call was inadmissible under the Confrontation Clause, and, when he objected at trial, he renewed the previously made objections to the admission of the call. However, the appellant argued in his motion *in limine* that the 911 call was hearsay that did not fall within any exception. Moreover, the circuit court stated that Betty's statements during the 911 call were hearsay but ruled they were admissible under Rule 5-803(b)(1)–(4). The issue was preserved for appellate review. *See* Md. Rule 8-131(a) ("Ordinarily, an appellate court will not decide any other issue unless *it plainly appears by the record to have been raised in or decided by the trial court* . . . .") (emphases added).

[OPERATOR]:     Okay. Now, **does this other person know that you're calling for an ambulance?**

[BETTY]:     **Yes.**

[OPERATOR]:     Okay. **But they don't know that I have pretty much figured out what happened, right?**

[BETTY]:     **Right.**

[OPERATOR]:     Okay. **Is it your husband?**

[BETTY]:     **No.**

\* \* \*

[OPERATOR]:     Okay. **Is it somebody that lives with you, like a significant other?**

\* \* \*

[BETTY]:     **My grandson.**

[OPERATOR]:     What did you say?

[BETTY]:     I don't have a [inaudible.]

[OPERATOR]:     Okay. **Is it somebody related to you?**

[BETTY]:     **Yes.**

\* \* \*

[OPERATOR]:     **So this person that pushed you, is it a male?**

[BETTY]:     **Yes.**

(emphasis added).

For convenience and reference, we treat the combined questions and answers highlighted above as equivalent to the following eight statements made by Betty:

33

1.  "Somebody is here with me."

2.  "I am in a situation where I can't tell you what happened."

3.  "This person knows I am calling for an ambulance."

4.  "This person doesn't know that you have pretty much figured out what happened."

5.  "This person is not my husband."

6.  "This person is my grandson."

7.  "This person is related to me."

8.  "The person that pushed me is male."

The appellant argues that Betty's statements about the identity and presence of her assailant were not made for purposes of medical treatment or medical diagnosis, emphasizing that none of the statements were pathologically germane to treatment. He also asserts that the statements were not admissible as excited utterances, present sense impressions, or statements of then-existing mental, emotional, or physical condition.

The State seems to implicitly agree, by not presenting any counterarguments, that these statements are hearsay and inadmissible as excited utterances; statements of then-existing mental, emotional, or physical condition; or statements made for purposes of medical treatment or medical diagnosis. Instead, the State claims all these statements, except the last one, were admissible as present sense impressions. It further argues that the erroneous admission of the last statement did not prejudice the appellant.

We conclude that Betty's hearsay statements listed under 1, 2, 3, and 4 above were admissible under the exception for present sense impressions. These statements reflect

Betty's perceptions of what the person with her knew or did not know when she spoke to the 911 operator. However, the hearsay statement listed under 8 was not admissible under the same exception, as it referred to who pushed her an hour earlier.

The parties disagree about the assertions in statements 5, 6, and 7. The appellant claims that these were assertions about who pushed Betty. Specifically, the appellant interprets them as Betty asserting: "This person [who pushed me] is not my husband," "This person [who pushed me] is my grandson," and "This person [who pushed me] is related to me." If this interpretation is correct, these hearsay statements would not be admissible under the exception for present sense impressions, as they described an event (the push) that occurred an hour earlier.

On the other hand, the State contends that these statements do not assert who pushed her; instead, they pertain to who was present with Betty as she was speaking to the 911 dispatcher. In other words, the State interprets Betty's statements as if she were asserting the following: "This person [who is with me right now] is not my husband," "This person [who is with me right now] is my grandson," and "This person [who is with me right now] is related to me." If this interpretation holds, these hearsay statements would be admissible under the exception for present sense impression.

We assume, without deciding, that the statements listed under 5, 6, and 7 were assertions about who pushed Betty about an hour earlier. Therefore, these statements do not fall within the exception for present sense impressions. However, any error in admitting these statements, along with the statement numbered 8, was harmless because other unobjected-to evidence established that Betty said the appellant pushed her. For instance,

35

the CAD report from the initial 911 call made by Chris reflected a dispute between "MOTHER VS HER GRANDSON," noting that she was "POSS[IBLY] PUSHED TO THE GROUND." In addition, the paramedic's report documented what Betty told Chris: that "her grandson had pushed her." Furthermore, in the recorded jail call, Angela recounted what Betty told her: the appellant "pushed [Betty]." Therefore, we conclude that any erroneous admission of statements numbered 5 through 8 was harmless, as they were cumulative to other evidence to the same effect.

## II.

### Doorbell Camera Footage

As mentioned, the circuit court admitted into evidence various clips from Betty's doorbell camera, but the only one at issue on appeal is the admission of the first clip, recorded at 5:30 p.m., which depicts the appellant calling a neighbor "bitch. You (indiscernible) bitch," and screaming, "[S]hut your motherfucking mouth. Really, come on, see you in the streets, bitch," and "[Y]ou Jewish bitch."

### A.

### Proceedings Below

At trial, the appellant argued that the clip was irrelevant to whether he assaulted Betty. He claimed that the clip depicted a prior bad act that was inadmissible under Maryland Rule 5-404(b). In addition, he claimed the clip's probative value was substantially outweighed by the danger of unfair prejudice.

The prosecutor responded that it was not bad acts evidence because there was nothing "illegal" about the appellant's conduct. According to the prosecutor, the clip was

relevant to show the "timeline" and the appellant's demeanor that "dovetail[ed]" with evidence about Betty's "very different demeanor." The prosecutor cited the appellant's later statement to Angela that Betty came at him, "[s]o his demeanor going into the incident, overlapping with Betty['s] demeanor . . . is just an important factor in this case."

After clarifying the timeline, the court ruled that "[g]iven the charges in the case and – the close proximity in time, I think that it could have some probative value." The court reasoned that it was "close enough in time" to the alleged push that its probative value outweighed its prejudicial effect, particularly in a bench trial. It explained that "for a jury trial, it might be a closer question, but I'm going to let it in for what it's worth."

**B.**

**Analysis**

Maryland Rule 5-404(b) provides:

> Evidence of other crimes, wrongs, or other acts including delinquent acts as defined by Code, Courts Article § 3-8A-01 is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.

In other words, evidence of other crimes or prior bad acts is not admissible to "prove the defendant's guilt based on propensity to commit crime or his character as a criminal." *State v. Faulkner*, 314 Md. 630, 634 (1989). The Rule "is designed to protect the person who committed the 'other crimes, wrongs, or acts' from an unfair inference that he or she is guilty not because of the evidence in the case, but because of a propensity for wrongful conduct." *Winston v. State*, 235 Md. App. 540, 563 (2018). Evidence of other crimes or

37

prior bad acts may be admissible, however, where "the evidence is 'specially relevant' to a contested issue, beside[s] an accused's propensity to commit crime, 'such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.'" *Burris v. State*, 435 Md. 370, 386 (2013) (quoting Rule 5-404(b)) (citing *Streater v. State*, 352 Md. 800, 807–08 (1999)).

A bad act is "an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Klauenberg v. State*, 355 Md. 528, 549 (1999). The State claims that the video clip depicting the appellant's demeanor did not meet the definition of a "bad act." It relies on *Klauenberg*, where the Supreme Court of Maryland determined that evidence that "[r]aising one's voice and poking someone in the chest alone is not conduct that tends to impugn someone's character." *Id.* at 551.

However, the behavior displayed in the video clip is different from merely raising one's voice and poking someone. In the clip, the appellant is seen screaming and cursing at a neighbor, apparently motivated partly by their religion, and threatening to fight them while gesturing emphatically and pacing around. Indeed, the prosecutor described the appellant's demeanor as yelling at his neighbor and "inviting them to come fight him, calling them a bitch. You can just tell he is angry." Furthermore, in his closing statement, the prosecutor characterized the appellant's conduct as "trying to pick fights with people walking their dog in the street" and "tr[ying] to punch a stranger apparently because of their religion." We conclude that the appellant's conduct depicted in this clip negatively reflects upon his character and was bad acts evidence under Rule 5-404(b).

38

As for special relevance, the State argues that the clip showing the appellant's demeanor was introduced to rebut his later claim that Betty came at him. The State contends that evidence of his behavior before the assault made it more probable that the appellant was the aggressor. However, the State seems to recast the prosecutor's argument. The prosecutor did not expressly state that the clip was introduced to rebut the appellant's claim about Betty being the aggressor. While the prosecutor did mention the appellant's statement regarding Betty's actions, the prosecutor's main argument for the clip's admission was that it illustrated the appellant's demeanor leading up to the assault ("his demeanor going into the incident, overlapping with Betty['s] demeanor, . . . is just an important factor to this case"). The prosecutor emphasized the timing rather than directly challenging the claim that Betty came at him: "If we were talking about . . . like, noon earlier in the day, I would get it. I wouldn't even be trying this." The court recognized that the focus was on the timing of the appellant's demeanor when it admitted the clip: "Given the charges in the case . . . and *the close proximity in time*, I think that it could have some probative value." (emphasis added).

Contrary to the State's contention, the prosecutor offered the clip to prove something it could not under Rule 5-404(b): that the appellant's bad conduct towards someone else made it more likely that he killed Betty about an hour and a half later. This is evident in the prosecutor's closing statement, where he referred to the clip as evidence of "malicious intent" that justified a finding of second-degree murder. The prosecutor outlined the timeline of events, starting with the clip that showed the appellant "trying to pick fights with people walking their dog in the street" at 5:30 p.m. He reiterated that these

39

events were "bookended by violence and maliciousness," beginning with the appellant trying to "punch a stranger apparently because of their religion" at 5:30 p.m. and concluding with his statement to his friend that he "killed her" at 6:57 p.m. Since the clip showing the appellant's bad conduct was being offered for propensity, it should have been excluded.

The erroneous admission of the video clip, however, was harmless beyond a reasonable doubt. As noted, the prosecutor relied on the video clip from 5:30 p.m. to support a conviction for second-degree murder. The court, however, was not convinced and found the appellant not guilty of that offense. After outlining the elements of second-degree murder under different modalities (such as the intent to kill or acting with extreme disregard for human life), the court concluded that, while it was certain that the appellant intentionally pushed Betty, "*any conclusions* of assaultive behavior *beyond that would be speculative . . . .*" (emphasis added).

We are satisfied that the court did not consider the video clip from 5:30 p.m. in finding the appellant guilty of manslaughter. The prosecutor argued that, at the very least, Betty's statements during the 911 call proved that the appellant was guilty of manslaughter because "it's pretty obvious that [the appellant] caused" Betty's death. During its closing statement, the defense conceded that if the court believed the appellant "did something, then a verdict of involuntary manslaughter is perfectly appropriate."

The court found the appellant guilty of involuntary manslaughter, stating that it had "no doubt" he "intentionally pushed" Betty, "causing her to fall and hit her head, thereby sustaining a brain injury which resulted in her death." The court explained that the appellant

lived with Betty and knew her age and frail condition. Therefore, the act of pushing her, a "frail" and "elderly woman," constituted a grossly negligent act; the appellant acted in a manner that created a high risk to, and showed a reckless disregard for, Betty's life. In addition, pushing her also was an unlawful act of assault. The court did not suggest that the video clip from 5:30 p.m. played any role in finding the appellant guilty of involuntary manslaughter. Indeed, the evidence that the appellant pushed Betty and caused the injuries that led to her death came from sources other than the 5:30 p.m. video clip. We are satisfied from the record that the error in admitting the video clip did not contribute to the court finding the appellant guilty of manslaughter.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**